**AIR LINE PILOTS ASSOCIATION, Petitioner,**

**v.**

**FEDERAL AVIATION ADMINISTRATION and United States Department of Transportation, Respondents.**

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Petitioner,**

**v.**

**FEDERAL AVIATION ADMINISTRATION and United States Department of Transportation, Respondents.**

Nos. 91–1536, 91–1537.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 11, 1993.

Decided Sept. 17, 1993.

As Amended Sept. 20, 1993.

Clay Warner, Washington, DC, argued the cause for petitioners. With him on the joint briefs were Gary Green, R. Russell Bailey, and Roland P. Wilder, Jr. Patrick J. Riley, Washington, DC, also entered an appearance for petitioner Intern. Broth. of Teamsters.

Thomas L. Ray, Atty., U.S. Dept. of Transp., Washington, DC, argued the cause for respondents. With him on the briefs were Walter B. McCormick, Gen. Counsel,

and Paul M. Geier, Asst. Gen. Counsel for Litigation, U.S. Dept. of Transp., and Robert B. Nicholson and Robert J. Wiggers, Attys., Dept. of Justice, Washington, DC.

Before: MIKVA, Chief Judge, SILBERMAN and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

MIKVA, Chief Judge:

The "Employment Protection Program" of the Airline Deregulation Act ("ADA" or "Act"), 49 U.S.C.App. § 1552, authorizes the Secretary of Labor to provide limited unemployment compensation to certain airline industry employees who lose their jobs because of the deregulation provisions of the Act. The Air Line Pilots Association and the International Brotherhood of Teamsters challenge the conclusion of the Department of Transportation ("DOT" or "Department") that certain airline workforce reductions were not "qualifying dislocations" making former employees eligible for the special unemployment benefits of the Act.

The Department's conclusion that the employee dislocation at Braniff International Airlines was not a "qualifying dislocation" under the Act is internally inconsistent, arbitrary and capricious, and not supported by substantial evidence on the record. The Department failed to explain the inconsistency of treating Braniff's expansion as merely "enabled" but not "caused" by the Act, and at the same time considering the expansion of competing carriers to have been "caused" by the Act. Moreover, the Department erred in concluding that much of Braniff's post-deregulation competition was possible under fare flexibility policies put in place shortly before the passage of the Act and should not be considered ADA-related. Finally, the Department completely failed to consider the loss of the economic value of Braniff's route certificates after the passage of the Act.

Although the Department order under review involved dislocations at five airlines, the petitioners' argument as presented in their briefs is limited to the Department's findings with regard to Braniff. Therefore, we ad-dress only the Braniff dislocation and remand to the Department for further proceedings consistent with this opinion. The Department may consider whether the basis of the remand counsels reconsideration of the decisions with respect to the other four airlines.

## I. BACKGROUND

In 1978, Congress enacted the Airline Deregulation Act, Pub.L. No. 95–504, 92 Stat. 1705, effectively terminating a longstanding system of economic regulation of air carriers and introducing a regime in which market forces would play a dominant role in determining rates, routes, and market entry in the commercial airline industry. *See generally Alaska Airlines v. Brock,* 480 U.S. 678, 680. Section 43 of the Act, 49 U.S.C.App. § 1552, establishes an Employee Protection Program ("EPP") designed to ensure that the public benefits flowing from deregulation would not be "paid for" by airline employees who had relied on the heavily regulated nature of the industry in deciding to accept and retain their positions. *See id.*

The EPP authorizes the Secretary of Labor to provide limited unemployment benefits (subject to congressional appropriations) to certain long-term, "protected" employees who lose their jobs or suffer a reduction in compensation as the result of a "qualifying dislocation." *See* 49 U.S.C.App. § 1552(a), (h). The Act defines a "qualifying dislocation" as

> a *bankruptcy or major contraction* of an air carrier ..., occurring during the first 10 complete calendar years occurring after October 24, 1978, the *major cause* of which is the change in regulatory structure provided by [the Act], as determined by the Civil Aeronautics Board.

*Id.* § 1552(h)(2) (emphasis added). The parties agree that the workforce reductions in question involved "bankruptcy or major contraction" within the meaning of the Act, but the Air Line Pilots Association and the International Brotherhood of Teamsters (collectively "ALPA") challenge the Department's conclusion that the ADA was not the "major cause" of the layoffs. The Act does not

define the term "major cause." The Department's definition and application of that term are the central issues in this appeal.

The Department concluded that the ADA was not the major cause of the layoffs in question through an unconventional series of administrative proceedings. For the seven years prior to its sunset, the Civil Aeronautics Board ("CAB" or "Board") was responsible for determining whether unemployed airline workers qualified for benefits under the EPP. *See* 49 U.S.C.App. § 1552(h)(2). The CAB began receiving applications from displaced airline workers in January of 1979. Although the CAB began to develop guidelines for processing the EPP applications, it had neither rejected nor granted any applications before it ceased to exist at the end of 1984. *See Air Line Pilots Association v. Civil Aeronautics Board,* 750 F.2d 81 (D.C.Cir.1984) ("*ALPA v. CAB* "). In a challenge brought by the Air Line Pilots Association, we held that the Board had unreasonably delayed the processing of the applications. *Id.* We remanded for further proceedings, stating that DOT would be subject to the Court's continuing jurisdiction when the defunct CAB passed the handling of the EPP applications on to the Department, and instructing DOT to expedite processing of the applications. *Id.*

After our decision in *ALPA v. CAB,* the Department adopted what it termed a "lead case" approach to processing the EPP applications. DOT had received EPP applications from employees of thirteen different airlines. The Department chose lead cases involving five airlines to be litigated fully before Administrative Law Judges ("ALJs"), and then reviewed as a group by the DOT decisionmaker. These lead cases involved employee dislocations at Braniff International Airways, Air New England, Mackey International Airlines, Pan American World Airways, and United Air Lines. The Department stated that none of the lead cases would be reviewed until all of them had been decided by ALJs. DOT also announced that decisions on all applications would be held in abeyance, and no further hearings would commence, until final resolution of the lead cases. *See Employee Protection Program Investiga-tions,* DOT Order 91–9–20, at 11 (September 11, 1991) ("*DOT Order* ").

The four ALJ decisions in the lead cases (the Air New England and Mackey International cases were consolidated) were issued between September of 1986 and February of 1990. *See Air New England,* DOT Docket Nos. 40201 and 39783 (ALJ September 22, 1986) ("*Air New England/Mackey* "); *Braniff International Airways,* DOT Docket No. 38978 (ALJ May 12, 1988) ("*Braniff* "); *Pan American World Airways,* DOT Docket No. 38883 (ALJ July 7, 1989) ("*Pan Am* "); *United Air Lines,* DOT Docket No. 38571 (ALJ February 28, 1990) ("*United* "). The ALJ in *Braniff* concluded that the major cause of Braniff's bankruptcy was the regulatory changes of the ADA. The ALJ in *United* held that the ADA was the major cause of one of the two workforce reductions at issue. The ALJs in the other lead cases, *Air New England/Mackey* and *Pan Am,* held that the major contractions at those airlines were not caused by the ADA.

The DOT reviewed all of the ALJ decisions and held in the *DOT Order* under review that the ADA was not the major cause of any of the dislocations, essentially reversing the ALJ decisions in *Braniff* and *United,* and affirming them in *Air New England/Mackey* and *Pan Am.* The *DOT Order* began by addressing certain "common issues" and, following the approach of the CAB, articulating general principles for applying the EPP provisions of the Act. The *DOT Order* went on to apply its guidelines to the distinct facts of the employee dislocations at each of the five carriers. ALPA challenges the guidelines defining "major cause" and their application to the employee dislocations in the lead cases.

The portion of the *DOT Order* discussing the definition of "major cause," *see DOT Order* at 22–27, mentions only one of the four ALJ opinions, the decision in *Braniff.* Thus, a brief review of the facts surrounding the Braniff employee dislocation is in order. Braniff operated during the era of airline regulation as a highly successful trunk air carrier, with a domestic route structure hubbed at Dallas–Fort Worth and international operations to South America and Lon-

don. The airline was healthy and generally well-situated relative to its competitors in the previously existing regulated marketplace. *DOT Order* at 41–42; *Braniff* at 54, 56–57.

But Braniff feared the prospect of an unprotected market. Its pre-deregulation route structure included many monopoly and near-monopoly routes that would become subject to entry from larger and better-financed carriers. Braniff believed these carriers would be able to siphon off Braniff passengers for two reasons. First, other carriers offered a broader array of destinations, which would enable them to lure away customers whose entire itinerary could not be serviced by Braniff. Second, other carriers had larger cash reserves and a correspondingly superior ability to withstand an extended price-cutting battle. *See DOT Order* at 42; *Braniff* at 54–55, 58–59.

Braniff responded to the passage of the ADA by embarking on a massive expansion, becoming the sixth largest trunk carrier in the nation by 1979. But Braniff soon discovered that it had expanded too far and too fast. Unable to sustain the costs of its expansion in the face of tough competition, rising jet fuel and borrowing costs, a general economic recession, and several other factors, Braniff eventually reversed its expansion and attempted to retrench in its traditional, prederegulation markets. Braniff's efforts came too late. The airline suffered major losses over the next two years and ceased operations on May 12, 1982, filing for bankruptcy protection the following day. *See DOT Order* at 43–57; *Braniff* at 55–56, 66–70.

Having set out this general background, we return to the discussion in the *DOT Order* of the definition of "major cause." ALPA does not contest the "major" element of the definition. The Department adopted the CAB approach in this regard, holding that " 'the major cause' should be a 'substantial' cause, as well as a cause more important than all others." *DOT Order* at 24. The Department "recognize[d] the difficulties with quantification of possible causation factors," but nonetheless adopted the CAB guideline that an ALJ "should not find a qualifying dislocation unless [at least] 40 per-

cent of a bankruptcy or major contraction was caused by the change in regulatory structure" implemented by the ADA. *DOT Order* at 24 (quoting *Employment Protection Program Investigation*, CAB Order 83–4–36 (April 7, 1983)).

ALPA does take issue with the "cause" element of the equation set out in the *DOT Order*. The ALJ in *Braniff* held that if management

> could not have made a particular decision before the ADA, and could and did make the decision following the ADA, then the effects of the decision should . . . be classified as having been 'caused by deregulation.'

*Braniff* at 24; *see also DOT Order* at 24. DOT rejected this definition as overbroad because it included decisions, such as Braniff's decision to expand rapidly, that were "enabled" but not "caused" by the ADA. The Department stated that it would look "not to whether particular business decisions would have been possible prior to the ADA, but rather to why those decisions failed." *DOT Order* at 27. The *DOT Order* explains as follows:

> If they failed because of other independent factors such as the PATCO strike, the rise in jet fuel prices, or the recession, then no qualifying dislocation will be found. If they failed because of route or fare competition from carriers that entered [Braniff's] markets under ADA authority, or similar factors that are closely connected with the effects of ADA, then a qualifying dislocation may be found.

*Id.*

The Department applied its guidelines defining "caused by deregulation" to each of the five carriers involved in the lead cases and concluded that none of the workforce reductions were qualifying dislocations under the Act because they were all substantially caused by factors unrelated to the change in regulatory structure implemented by the ADA.

## II. ANALYSIS

■ Insofar as the *DOT Order* involves a pure question of statutory interpretation—

the definition of the admittedly undefined term "major cause"—we must uphold the Department's interpretation unless it constitutes an unreasonable construction of the Act. *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Department's other findings and conclusions will be set aside if they are "arbitrary, capricious, an abuse of discretion" or "unsupported by substantial evidence on the record." 5 U.S.C. § 706(2)(A), (E).

The DOT's conclusions with respect to Braniff involve both standards of review, presenting mixed questions of law and fact. The conclusions fail under both standards. To the extent that *Chevron* deference is due to the Department's construction of the ADA, the *DOT Order* presents an interpretation of the EPP which is internally inconsistent and therefore unreasonable and impermissible under *Chevron.* As to the Department's factual findings with regard to the Braniff dislocation, they are arbitrary and capricious or unsupported by the record in several respects.

### A. The Cause of Braniff's Expansion Program

■ The *DOT Order* must be remanded because of a basic inconsistency in its reasoning with regard to the "cause" of the Braniff employee dislocation. The Department concludes on the one hand that Braniff management decisions that were "enabled" but not "compelled" by the Act were not *caused* by the changes in the airline regulatory structure. *DOT Order* at 26–27. At the same time, the Department considers competition from other carriers to have been caused by the Act despite the fact that the competition was also "enabled" rather than "compelled." The Department does not explain why competition against Braniff—competition that resulted from expansion made possible, but not compelled, by the Act—is treated differently from the expansion decision of Braniff, the carrier that employed the dislocated workers. That expansion was likewise enabled, but not compelled, by the ADA.

In setting out the manner in which ALJs are to assess the role of competition in reviewing EPP applications, the Department states as follows:

> Competition that occurs in a carrier's market after the enactment of the ADA must be closely scrutinized to ascertain whether that competition is fairly attributable to changes in the regulatory structure provided by that Act.... [R]oute *competition between carriers [that] had authority in given markets before the ADA, and which was affected negligibly or not all by new entrants relying on ADA programs for entry, is not caused by the ADA.*
>
> ....
>
> Also, although the ADA *enabled* carriers to enter new markets, often causing incumbent carriers to lose market share, it also *allowed* those incumbent carriers themselves to enter other new markets.... To gain a true picture of the *impact of deregulation,* losses in pre-ADA markets *caused* by new competition must be considered in relation to gains *resulting* from a carrier's post-ADA entry into other markets.

*DOT Order* at 31–32 (emphasis added). The Department also describes "route or fare competition from carriers that entered [an incumbent's] markets under ADA authority" as "closely connected with the effects of ADA" and properly considered in determining the cause of a dislocation. *Id.* at 27. Thus, the Department assumes that competition through expansion by other carriers was caused by the Act, and at the same time treats Braniff's decision to expand as purely discretionary. Moreover, Braniff's expansion *is* considered as an offset to the expansion of new carriers into Braniff markets, but not in the first instance as an expansion caused by the ADA. These anomalies produce inconsistent and irrational results.

For example, according to the Department, *Braniff's* decision to expand is *not* caused by the Act when its employees apply for EPP benefits, but similar expansion decisions by other carriers *are* caused by the Act when viewed from the perspective of the EPP application of the Braniff employees. Another internal inconsistency is revealed if we imagine an EPP application from employees of another carrier that faced new competition from Braniff because of Braniff's post-

ADA expansion into the second carrier's market. The Department guidelines would dictate that the Braniff expansion was caused by the ADA and should be considered, subject to the qualifications set out in the *DOT Order*, in assessing the application of dislocated workers of the second carrier. The *very same* expansion decisions, by the *very same* carrier, would be treated differently depending on whose employees are asking for EPP benefits. In light of these fundamental inconsistencies, the DOT guidelines regarding causation are unreasonable and impermissible under *Chevron*, and the DOT conclusion that Braniff's expansion was not caused by the ADA is arbitrary and capricious. The *DOT Order* must be remanded to the Department for further consideration of these issues.

Before moving on to the additional infirmities in the *DOT Order*, we briefly discuss a point of some confusion in the briefs in the hope that the Department can clarify the matter on remand. Both parties devote considerable attention in their briefs to whether the ADA was a major cause of Braniff's *expansion program*. This approach is incomplete in an important respect, but one which does not bear directly on our holding or reasoning. The relevant issue is not merely whether the ADA caused the expansion program, but rather whether the Act was the major cause of the Braniff *bankruptcy* alleged to be the qualifying basis of EPP benefits. *See* 49 U.S.C.App. § 1552(h)(2). Thus, if the Department determines on remand that the ADA did cause the Braniff expansion, the Department must still address whether the expansion failed on account of the ADA, and if so, whether the failed expansion was the major cause of the Braniff bankruptcy.

**B.** *Competition Possible Before Passage of the ADA*

The Department's approach to causation with respect to competition from other carriers suffers from an additional infirmity. DOT concluded that post-ADA price competition from carriers that already had authority to operate in Braniff markets would not be considered ADA-related. The Department

reasoned that price competition from these carriers was already possible under the CAB's fare flexibility policy, which was put in place shortly before the passage of the Act. *See DOT Order* at 29–30. ALPA argues in response that the new fare policy, known as PS–80, was of questionable legal validity, that it was passed only in anticipation of the ADA, and that the price competition that Braniff actually experienced came from carriers acting within the new ADA framework rather than the CAB policy.

Congress was aware of the CAB's new fare policy when it was considering the ADA. The legislative history is replete with evidence that Congress believed that the Act was necessary, despite the CAB move toward deregulation, because the legality of PS–80 in the absence of statutory revisions was quite questionable, and also because the CAB might decide to reverse its policies. The House Report stated as follows:

> An obvious question is why statutory change is needed if the CAB is already moving in the direction of less regulation.... First, a revised act is needed to insure that future CAB's do not undo the work of the present CAB and reimpose strict regulation. And even with respect to the current Board its programs have not been subjected to complete judicial review, and it is not clear that the courts will conclude that existing law allows these programs.

H.R.Rep. No. 1211, 95th Cong., 2d Sess. 4 (1978). A prominent supporter of the ADA stated on the Senate floor, in response to suggestions that statutory reform was not necessary in light of the CAB fare initiatives, that "the [CAB] fares were not offered to the public until reform legislation was introduced[, and] the current Board has had to stretch the current law almost to the breaking point in order to insure prompt approval of these reduced fares." 124 Cong.Rec. 10653 (1978) (statement of Senator Percy). Another Senator noted that CAB Chairman Alfred Kahn shared the concern that CAB policy could be reversed in the absence of legislative reform. *See id.* at 10648 (1978) (comments of Senator Cannon (quoting the views of the CAB Chairman)).

The Department argues that PS–80 was in effect before the ADA, and that the fact that it was announced only after the introduction of the ADA bill, and only two months before the passage of the Act, is therefore irrelevant. However, these arguments do not address the fundamental concern over the legality of PS–80, or the possibility that the CAB policy could be reversed in the absence of the ADA. PS–80 did not make any permanent change in the structure of airline fare regulation. It was the ADA that statutorily mandated the changes in CAB's authority and ability to regulate discount fares, and at the same time rendered moot any legal challenge to PS–80. The Department's conclusion that the Act's pricing provisions were not "change[s] in regulatory structure provided by [the Act]," 49 U.S.C.App. § 1552(h)(2), was unreasonable.

### C. Loss of the Economic Value of Route Certificates

The Department concedes that it declined to address ALPA's argument that the ADA eliminated the economic value of Braniff's route certificates, thereby greatly diminishing Braniff's attractiveness as a merger target and contributing significantly to the bankruptcy. DOT defends its decision not to consider this factor by asserting that it had already assured itself that jet fuel prices, interest rates, and the recession were the major causes of Braniff's failure. This is the very embodiment of arbitrary action. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (agency acts arbitrarily by "entirely fail[ing] to consider an important aspect of the problem"). At the very least, DOT is required to provide a reasoned explanation on the record for its conclusion that the diminished value of Braniff's route certificates was insignificant relative to the factors identified as the major cause of Braniff's bankruptcy.

### D. The Department's Rejection of ALPA's Econometric Studies

ALPA also challenges the Department's refusal to consider an econometric analysis submitted by the petitioners, especially in light of the Board's statement that "the application of econometrics would greatly assist in determining whether the ADA was the major cause of loss of employment." *Employment Protection Program Investigation,* CAB Order 83–4–36 (April 7, 1983). The Department made the following conclusion with respect to the econometric studies that the parties submitted:

> After reviewing the merits and the flaws in the models of both [parties], we do not find them of significant probative value in this case. Thus, we do not attempt to base any conclusions on them.

*DOT Order* at 65.

In light of our remand for further proceedings to remedy the inconsistencies in the Department's approach to causation, we do not reach the propriety of the Department's rejection of the econometric studies. ALPA should be permitted to submit new or revised studies on remand, which the Department can evaluate in the process of reconsidering its previous order.

### E. Remand with Respect to the Dislocations at Other Carriers

The *DOT Order* set out general guidelines and also made final findings with regard to dislocations at five airlines. But ALPA focuses in its briefs solely on the Braniff employee dislocation. There is some justification for this approach because, as we have noted, *see supra* p. 451, the discussion in the *DOT Order* of the "major cause" guidelines is limited to the *Braniff* ALJ opinion. However, the *DOT Order* also addresses each of the five dislocations individually and makes particularized findings of fact. *See supra* pp. 451–52. ALPA's failure to address the other dislocations in its briefs leaves the Court unable to make a definitive determination with regard to any airline except Braniff. We remand to the Department for proceedings consistent with this opinion, at which time the Department may consider whether the basis of our remand can affect its determination in the other dislocations disposed of in the *DOT Order.*

*So ordered.*