PROFESSIONAL PILOTS
FEDERATION, et al.,
Petitioners

v.

FEDERAL AVIATION
ADMINISTRATION,
Respondent.

Nos. 95–1604, 96–1025 and 96–1026.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 3, 1996.

Decided July 15, 1997.

760

Nicholas H. Cobbs, Washington, DC, argued the cause for petitioners, with whom Michael J. Pangia, Washington, DC, was on the briefs.

Christine N. Kohl, Attorney, U.S. Department of Justice, Washington, DC, argued the cause for respondent, with whom Frank W. Hunger, Assistant Attorney General, Washington, DC, and Robert S. Greenspan, Attorney, were on the brief.

Edgar N. James and Marta Wagner, Atlanta, GA, were on the brief for amicus curiae Allied Pilots Association. Martha L. Walfoort, Washington, DC, entered an appearance.

Aidan D. Jones, Washington, DC, was on the brief for amicus curiae Southwest Airlines Pilots' Association.

Before: WALD, GINSBURG, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Opinion concurring in part and dissenting in part filed by Circuit Judge WALD.

GINSBURG, Circuit Judge:

The Professional Pilots Federation and two individual pilots petition for review of two decisions of the Federal Aviation Administration: not to institute a rulemaking to relax the FAA Rule that requires commercial airline pilots to retire at age 60, and to extend application of the Rule to commuter airline operations. The Pilots contend, first, that the Rule unlawfully requires airlines to violate the Age Discrimination in Employment Act, *see* 29 U.S.C. § 621 *et seq.*, and, second, that the FAA acted arbitrarily and capriciously, in violation of the Administrative Procedure Act, when it decided to retain and expand the scope of the Rule. Finding merit in neither contention, we deny the petitions for review.

## I. Background

The FAA first promulgated the Age 60 Rule in 1959 pursuant to its mandate under the Federal Aviation Act of 1958 to ensure air safety. 24 Fed.Reg. 9767 (December 5, 1959). *See* 49 U.S.C. § 44701(a)(4) (authorizing Administrator to promulgate "regulations in the interest of safety for the . . . periods of service of airmen"); 49 U.S.C. § 44701(c) (requiring Administrator to regulate "in a

way that best tends to reduce or eliminate the possibility or recurrence of accidents in air transportation"); 49 U.S.C. § 44702(b)(1)(A) (requiring Administrator to consider "the duty of an air carrier to provide service with the highest possible degree of safety" when issuing an airman, air carrier, or other certificate); *Air Line Pilots Ass'n, Int'l v. Quesada,* 276 F.2d 892, 897–98 (2d Cir.1960). The agency concluded that the Rule would promote air safety after finding "that available medical studies show that sudden incapacitation due to heart attacks or strokes becomes more frequent as men approach age sixty and present medical knowledge is such that it is impossible to predict with accuracy those individuals most likely to suffer attacks." *Quesada,* 276 F.2d at 898. The Second Circuit, reasoning that it was not for a court to substitute its own "untutored judgment for the expert knowledge" of the agency, accepted this conclusion and dismissed an early challenge to the Rule. *Id.*

The FAA has reconsidered the Rule on several occasions. In the early 1960s, the agency began, but never completed, a study to determine the feasibility of testing individual pilots over the age of 60 in order to determine whether they remained fit to fly. *See Aman v. FAA,* 856 F.2d 946, 948 (7th Cir.1988). In 1970 the Air Line Pilots Association called upon the FAA to replace the blanket prohibition of the Age 60 Rule with a regime of individualized performance tests and medical evaluations, but the agency decided to retain the Rule because "an increase in the number of medical examinations administered to a given pilot ... would not be an effective deterrent to incapacitation inasmuch as the indices of such incapacitation are not now sufficiently developed." *See O'Donnell v. Shaffer,* 491 F.2d 59, 61 (D.C.Cir. 1974).

In 1979 the Congress directed the National Institutes of Health to determine whether the Rule was still medically warranted. *See* Pub.L. No. 96–171, 93 Stat. 1285; *see also Pilots Rights Ass'n v. FAA,* 86 F.R.D. 174, 176 (D.D.C.1980). In its final report, the NIH concluded that there was "no special medical significance to age 60 as a mandatory age for retirement of airline pilots" but recommended that the age 60 limit be retained nonetheless because there was still no "medical or performance appraisal system that can single out those pilots who would pose the greatest hazard because of early, or impending, deterioration in health or performance." *Report of the National Institute on Aging, Panel on the Experienced Pilots Study* 1 (August 1981).

In 1982 the FAA considered relaxing the Rule in order to allow a small group of pilots to continue flying until age 62 in order to generate data on their performance under actual operating conditions. 47 Fed.Reg. 29,-782 (July 8, 1982). The FAA ultimately determined, however, that "no medical or performance appraisal system can be identified that would single out pilots who would pose a hazard to safety." 49 Fed.Reg. 14,692, 14,-695 (April 12, 1984). Unable "to distinguish those pilots who, as a consequence of aging, present a threat to air safety from those who do not," the agency decided not to experiment with changing the Rule. *Id.*

The present litigation was stimulated, at least in part, by a 1993 study of the Age 60 Rule that was performed by Hilton Systems, Inc. for the FAA's Civil Aeromedical Institute. The Hilton Study correlated accident data for the period from 1976 to 1988 with pilot age and flying time. This analysis revealed "no support for the hypothesis that pilots of scheduled air carriers had increased accident rates as they neared the age of 60." Hilton Study at 6–2. On the contrary, the study found a "slight downward trend" in accident rates as pilots neared the age of 60. The authors cautioned, however, that this decrease might have resulted from "the FAA's rigorous medical and operational performance standards screen[ing] out, over time, pilots more likely to be in accidents."

Shortly after publication of the Hilton Study the FAA announced that it was again considering whether to institute a rulemaking concerning the Age 60 Rule and invited comments from the public on various aspects of the Hilton Study. 58 Fed.Reg. 21,336 (April 20, 1993). The agency held a public hearing in September 1993 at which 46 members of the public made presentations. The

agency also received more than a thousand written comments.

In July 1993 the Professional Pilots Federation filed with the FAA a rulemaking petition to repeal the Rule. The Pilots maintained that "time and empirical evidence have shown that the blanket elimination of the country's most experienced pilots is not justified in the interests of safety and, therefore, is arbitrary and capricious, and violates this country's policy of prohibiting employment discrimination on the basis of age."

In early 1995 after a series of accidents involving commuter airlines, the FAA proposed in a separate rulemaking to bring certain commuter operations, previously conducted under Part 135, under Part 121. 60 Fed.Reg. 16,230 (March 29, 1995). These operations would then become subject to the more stringent safety standards of Part 121, including the Age 60 Rule, relaxation of which the agency was still considering in the wake of the Hilton Study.

In December 1995 the FAA denied the Pilots' petitions to repeal the Age 60 Rule and decided not to institute a rulemaking in response to the Hilton Study. 60 Fed.Reg. 65,977 (December 20, 1995). The agency determined that the "concerns regarding aging pilots and underlying the original rule have not been shown to be invalid or misplaced," and concluded that the Rule was still warranted as a safety measure. Id. at 65,980. The FAA therefore retained the Rule, which provides that:

> No certificate holder may use the services of any person as a pilot on an airplane engaged in operations under [Part 121] if that person has reached his 60th birthday. No person may serve as a pilot on an airplane engaged in operations under [Part 121] if that person has reached his 60th birthday.

14 CFR § 121.383(c) (1996). In addition the FAA adopted its proposed rule bringing under Part 121 certain commuter operations previously conducted under Part 135. 60 Fed.Reg. 65,832 (December 20, 1995). As a result, these commuter operations became newly subject to the Age 60 Rule. The Pilots petitioned this court for review of both rulemaking decisions.

## II. Analysis

The Pilots challenge the FAA's decision not to institute a rulemaking to repeal the Age 60 Rule and its decision to apply the Rule to commuter airlines as violations of both the ADEA and the APA. First, the Pilots assert that by requiring the airlines to discriminate on the basis of age the Rule is in "direct conflict" with the ADEA. Second, they claim that the agency violated the APA by: (1) not affording adequate consideration to the reasonable alternatives proposed by various commenters; (2) reaching a decision that is against the weight of the evidence; and (3) failing to provide any reasoned basis for treating older pilots differently than other groups of pilots who create as great or greater a safety risk.

### A. The ADEA

The Pilots argue that the Age 60 Rule violates the ADEA because it requires the airlines to discriminate against older pilots and because the FAA need not have relied upon an age-based Rule in order to achieve its objective of air safety. The agency, we are told, could instead have implemented a scheme of medical evaluations and individualized testing in order to determine whether each pilot remains fit to fly. In any event, in the ADEA the Congress spoke directly to the role that age may play in employment decisions and the FAA cannot—as a matter of logic if not of statutory interpretation—countermand that clear statutory command through an exercise of its rulemaking authority.

The FAA responds that the ADEA speaks only to employers—including federal agencies acting in their role as employers—and therefore places no substantive limitation upon the agency's power to regulate airline safety pursuant to the mandate of the Federal Aviation Act. In the alternative, the FAA contends that if the ADEA does apply to the air safety rules it promulgates, then the Age 60 Rule comes within the exception in § 623(f)(1) of that statute for a bona fide occupational qualification. 29 U.S.C. § 623(f)(1).

The FAA bases its first point upon the central provision of the ADEA itself, which states that "it shall be unlawful for an employer" to discriminate in employment upon the basis of age. § 623(a). The FAA argues that it promulgated the Age 60 Rule in its capacity not as an employer but as a regulator; in that capacity the agency is specifically authorized, *inter alia,* to prescribe "regulations in the interest of safety for the maximum hours or period of service of airmen." 49 U.S.C. § 44701(a)(4); *see also id.* at § 44702. Absent a provision in the ADEA comparably specific or otherwise capable of overriding the authorization of § 44701—"not withstanding any other provision of law" comes to mind—the ADEA places no limitation upon the rulemaking authority of the FAA.

The FAA also contrasts the ADEA with the Rehabilitation Act, in which the Congress expressly subjected the programmatic activities of the Government to the stricture against discrimination. *See* 29 U.S.C. § 794(a) (providing that no qualified person shall be discriminated against for a disability "under any program or activity conducted by any Executive agency"); *see also Buck v. U.S. Department of Transportation,* 56 F.3d 1406, 1408–09 (D.C.Cir.1995). Absent a similarly plain and unequivocal expression of intent, the FAA urges that we ought not lightly infer that the Congress intended to compromise its single-minded pursuit of safety in the air.

■ We agree with the FAA that the ADEA places no substantive limitation upon the agency's authority to act as a regulator of the airline industry. The statute prohibits both an employer in the private sector and an agency of the federal government from discriminating upon the basis of age in making employment decisions. 29 U.S.C. §§ 623, 633(a). Nothing in the Act can plausibly be read to restrict the FAA from making age a criterion for employment when its acts in its capacity as the guarantor of public safety in the air. The general prohibition of the ADEA, addressed as it is to employers, should not be read by mere implication to override the specific grants of authority to the FAA in 49 U.S.C. § 44701. If the Con-

gress intends to limit the means available to the FAA in its pursuit of air safety, we trust it will say so rather than leave the matter to the courts to infer. Therefore, we conclude that the ADEA does not limit the authority of the FAA to prescribe a mandatory retirement age for pilots; as a result, we need not reach the question whether the Age 60 Rule constitutes a bona fide occupational qualification within the meaning of § 623(f)(1) of that Act.

### B. The APA Challenges

■ We will defer to the FAA's decisions to retain the Age 60 Rule and to bring commuter airlines under the Rule unless those decisions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 41, 103 S.Ct. 2856, 2865–66, 77 L.Ed.2d 443 (1983). More particularly, the agency must have offered a reasoned explanation for its chosen course of action, *see FEC v. Rose,* 806 F.2d 1081, 1088 (D.C.Cir.1986), responded to "relevant" and "significant" public comments, *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35 n. 58 (D.C.Cir.1977), and demonstrated that it afforded adequate consideration to every reasonable alternative presented for its consideration. *See Public Citizen v. Steed,* 733 F.2d 93, 103–04 (D.C.Cir.1984).

■ With respect to its decision not to convene a rulemaking in order to repeal or modify the Age 60 Rule, the FAA argues that the appropriate standard of review is the even more deferential standard we apply to an agency's decision not to institute a rulemaking proceeding. *Cellnet Communication, Inc. v. FCC,* 965 F.2d 1106, 1111–12 (D.C.Cir.1992). That more deferential standard of review is indicated, however, only when the agency has clearly shown that "pragmatic considerations" would render the usual and somewhat more searching inquiry problematic because "the agency has chosen not to regulate for reasons ill-suited to judicial resolution, e.g., because of internal management considerations as to budget and personnel or for reasons made after a weighing of competing policies." *See Bargmann v.*

*Helms,* 715 F.2d 638, 640 (D.C.Cir.1983) (reviewing FAA decision not to institute rulemaking to require first-aid kits on commercial aircraft). In the case now before us the decision not to institute a rulemaking looking toward repeal of the Age 60 Rule was purportedly based upon the merits of the existing Rule. We see no need, therefore, to afford the agency more than the usual—and considerable—deference we show an agency when it adopts a rule implementing a statute it is charged with administering. We shall therefore apply the arbitrary and capricious standard of the APA.

### 1. Consideration of alternatives

Various parties filing comments before the FAA proposed two alternatives to the present Rule. First, they suggested periodic performance checks designed to determine, on an individual basis, whether a pilot remains fit to fly. Second, they proposed allowing a group of pilots over the age of 60 to continue flying commercial passenger aircraft in order to gather the data that the FAA would need to make a reasoned decision about whether the current retirement age of 60 could safely be moved up to perhaps age 62 or 63. The Pilots now press both alternatives upon us.

### a. Periodic performance checks

The FAA rejected periodic performance checks on the ground that they only "verify the state of a pilot's performance at the time of the checks." They do not detect "early or subclinical cognitive defects that may subtly degrade performance" and "do not predict whether an individual pilot's performance will degrade at any time in the future as a result of age." The Pilots assert that rather than afford adequate consideration to this proposal the agency blindly relied upon its 1984 determination that there are no valid tests capable of screening out pilots likely to suffer from age-related impairment. The FAA, we are told, did not even acknowledge that a detailed testing protocol had been presented to the agency during a 1985 hearing before the House Select Committee on Aging. The FAA also purportedly failed adequately to respond to the EEOC's observation that several non-Part 121 operators, most notably the Boeing Corporation, have adopted individualized testing in order to settle various suits brought against them under the ADEA. The Pilots fault the FAA for responding to the EEOC's detailed comment with the simple assertion that it had "not been apprised of the testing protocols or of the results of any such testing, ha[d] not seen them discussed in the medical literature, and ha[d] not been party to the agreements."

The FAA responds by pointing out that it did evaluate the specific testing regimens proposed by the commenters before finally concluding that testing individual pilots is an inadequate substitute for the Age 60 Rule. In the final rule document the agency observed that available tests: (1) evaluate only a pilot's present performance and cannot be used to predict the sudden onset of an age-related impairment, such as early or subclinical cognitive defects; (2) cannot measure the subtle degradation of skills that may prove serious in the cockpit; and (3) do not evaluate how a pilot responds to stress and fatigue.

The FAA contends that its response to the comment submitted by the EEOC was entirely adequate in light of the purely anecdotal evidence that the EEOC offered in support of its assertion that individualized testing has proven to be a viable substitute for a bright-line rule based upon age. The EEOC's principal evidence is that it reached a settlement agreement with Boeing under which that company's pilots were for a time allowed to continue flying until the age of 63. The FAA acknowledges as much but is quick to point out that: (1) the EEOC lawyer who oversaw the Boeing litigation observed in a 1991 article published by the Flight Safety Foundation that the full impact of the agreement upon safety remained to be assessed; (2) no account of Boeing's experience has yet been published; (3) Boeing pilots are corporate pilots who do not fly under Part 121; and (4) a Boeing representative had testified before the agency that "neither the information uncovered as a result of this effort nor subsequent Boeing ... experience with our medical and neuropsychological protocols ... gives us confidence that means are cur-

rently available to detect or predict age-related problems which may have [an] adverse [effect] on safety."

The Pilots also claim that the agency's rejection of individualized testing for pilots over the age of 60 is inconsistent with its acceptance of monitoring and testing for younger pilots with certain known medical conditions. The FAA maintains that it did in fact offer an adequate explanation for the apparent inconsistency when it specifically found that, although a younger pilot with a diagnosed medical condition may be monitored,

> such is not the case in aging, since there are no generally applicable medical tests that can, at this time, adequately determine which individual pilots are subject to incapacitation secondary to either acute cardiovascular or neurological events or to more subtle adverse conditions related to decline of cognitive functioning.

60 Fed.Reg. at 65,984. For example, a pilot with a diagnosed heart condition can be tested and monitored in order to determine whether there is a significant risk that he will suffer a heart attack. The FAA allows this pilot to continue flying provided that his doctors have determined that the risk of his suffering a sudden unexpected impairment due to his heart condition is *de minimis*. There are no tests, however, that can accurately determine the risk of an apparently healthy but older pilot suddenly being stricken by any one of the many potentially disabling conditions that may accompany advancing age.

■ We conclude that the FAA afforded adequate consideration to the alternative of individualized testing. The FAA explained that even state-of-the-art testing cannot screen out potentially risky pilots. The EEOC did not offer any data in support of its assertion that allowing pilots to fly until the age of 63 would not compromise safety; the FAA simply cannot be faulted for failing to explain away data that are not part of the record.

Finally, we conclude that the FAA adequately explained the difference in treatment it affords to pilots over the age of 60 who have no known medical condition and to younger pilots who do have a known medical condition. The risk of allowing the younger pilot to continue flying is negligible provided—and it is this critical proviso that our colleague in dissent seems to ignore—that "the agency has been able to develop a means of assessment and surveillance specifically designed to demonstrate the individual's capabilities and to identify any adverse changes." Doctors are not only unable to determine whether an older but apparently healthy pilot will be afflicted with a dangerous condition; they are also unable to predict with which of the myriad conditions that accompany advancing age an individual pilot is likely to be afflicted.* The FAA cannot practically monitor for the onset, and thereby avoid the consequences, of all potential hazardous medical conditions in an older pilot. Therefore, it was not unreasonable for the FAA to allow younger pilots with particular medical conditions to continue flying while, at the same time, not allowing pilots over the age of 60 to do so.

b. Selecting a group of pilots over the age of 60.

The FAA also rejected the suggestion that a group of pilots over the age of 60 be permitted to continue flying under Part 121 in order to generate the data needed for the FAA to make an empirical judgment about whether the Age 60 Rule is reasonable. The Pilots contend, without elaboration, that the FAA failed to offer adequate consideration to this alternative. The FAA responds that it rejected this proposal because it did not have confidence that it could identify a cohort of vintage pilots who would not be susceptible to subtle impairments or to sudden incapacitation:

> The FAA withdrew [a similar plan] in 1984 because valid selection tests for the group did not exist. The FAA was concerned

---

\* Contrary to the impression created by the dissent, the FAA did not suggest "that it is more difficult to monitor known medical conditions in an older pilot than in a younger pilot." Dissent at 771,

n.3. Rather, the agency's concern was that it is more difficult to detect an unknown medical condition than to monitor a known medical condition.

that, without valid selection tests, these pilots would create an unacceptable safety risk in part 121 operations. The commenter does not suggest any data that indicates [sic] that a group described [sic] would be able to identify any such tests. The FAA has the same concerns today.

60 Fed.Reg. at 65,984.

As long as the FAA cannot identify good candidates for the experiment that the Pilots propose, we can hardly conclude that its refusal to run the experiment is arbitrary and capricious. On the contrary, it would be unreasonable for the court to require that the FAA periodically suspend its safety regulations in order to determine anew, upon the basis of (potentially disastrous) experience, whether they are still needed. Nor have the Pilots shown that such experimentation with the safety of passengers is permitted by the Federal Aviation Act. Indeed, the Congress arguably forbade it by requiring the FAA to "consider the duty of an air carrier to provide service with the highest possible degree of safety in the public interest." 49 U.S.C. § 44701(d)(1)(A).

■ Nothing in the record suggests that the FAA has, but refuses to act upon, the "valid selection tests" it would need in order to identify a group of low-risk pilots over the age of 60 who might safely continue to fly. Therefore we must conclude that the FAA did not act arbitrarily and capriciously—and was quite possibly acting as required by law—when it refused to waive the Rule in order to allow a selected group of pilots to fly commercial passenger aircraft after attaining the age of 60.

2. The rationality of age-based risk assessment

The Pilots assert that, in the course of defending the Age 60 Rule, the FAA drew several distinctions that reveal a " 'basic inconsistency in its reasoning' by applying similar concepts differently in parallel situations." *See Air Line Pilots Ass'n v. FAA*, 3 F.3d 449, 453 (D.C.Cir.1993). In particular, the Pilots maintain that the FAA's treatment of younger pilots, of pilots who do not fly under Part 121, and of foreign pilots cannot be reconciled with its treatment of Part 121 pilots over the age of 60.

a. Younger pilots

■ The Pilots claim that it is arbitrary and capricious for the FAA to ground older and more experienced pilots while allowing younger pilots to fly even though a younger pilot is more likely than an older pilot to cause an accident. To the commenters who argued that this is a contradiction, the FAA responded (in essence) that, however valuable experience may be, it is no match for a heart attack. Implicit in the FAA's decision is the view that a 40–year–old pilot with 15 years of experience is a safer bet than a 61–year–old pilot with 36 years of experience. The 61–year–old pilot's additional experience is outweighed, that is, by the heightened probability that he will lose his ability to fly safely—whether through gradual wear and tear or a sudden episode—and the disastrous consequences if he does. The FAA also maintains that the Pilots' argument is fundamentally flawed because it assumes that the FAA based its decision to retain the Age 60 Rule solely upon accident data. Accident data are one consideration, among many, that influenced the FAA's decision to select age 60 as the cut off; other data, such as the percentage of pilots suffering sudden heart failure, or a significant loss of vision or hearing, were also considered, and those data provide ample grounds for drawing a distinction between younger and older pilots. Indeed, according to the agency, all studies of the subject come to the conclusion that some mandatory retirement age for pilots is appropriate. The studies diverge only with regard to the precise age at which retirement should be mandated.

Finally, the FAA questions the assumption, implicit in the Pilots' argument, that relatively inexperienced pilots are replacing more experienced pilots as a result of the Age 60 Rule. Young pilots are rarely if ever given command of an aircraft before they have had significant experience. Older pilots, therefore, are typically "replaced by pilots who have substantial experience as pilots in the first officer position, and often as flight engineers before that."

We conclude that the FAA adequately justified its decision to distinguish between younger pilots and those over the age of 60. The agency reasonably concluded that the risk inherent in allowing an older pilot to fly outweighs the benefit of having a more experienced person in command. In contrast, the risk of allowing a younger pilot to serve in a noncommand role is negligible while the benefit of allowing him to gain experience is high.

b. Younger pilots with known medical conditions

■ The Pilots observe that the FAA sometimes will allow a younger pilot with a serious medical problem to continue flying even if his problem is characterized by a high rate of recurrence. It is arbitrary and capricious, the Pilots assert, to forbid an apparently healthy pilot over the age of 60 to fly because of the risk that he might have a first heart attack while, at the same time, allowing a younger pilot to fly in spite of the dramatically higher statistical risk that he might suffer a second heart attack.

The FAA defends its policy of granting exemptions to pilots who have experienced a serious medical problem on the ground that it does so only when the risk of a recurrence can be assessed adequately. A known condition can not only be monitored but also, as in the case of alcoholism and some heart conditions, controlled:

> When a special issuance medical certificate is granted, the condition in question has been clearly identified, and the agency has been able to develop a means of assessment and surveillance specially designed to demonstrate the individual's capabilities and to identify any adverse changes. If that is not possible, certification is not granted.

60 Fed.Reg. at 65,984. Meanwhile, the subtler forms of physical and mental decline that may accompany aging often cannot be detected, let alone monitored or controlled.

In sum, the FAA determined that there are techniques for monitoring the health of pilots with certain medical conditions but that there is not yet any way of predicting whether and when an older pilot is likely to develop a condition with a potentially serious impact upon his ability to fly an airplane safely. This difference between the two groups is fully adequate to warrant the distinction that the FAA has drawn between them.

c. Corporate aircraft and air taxis.

■ The Pilots next assert that the FAA has applied the Age 60 Rule arbitrarily without regard for either the type of aircraft being flown or the type of service being provided. Thus, the Rule applies to cargo carriers, where no passengers are at risk, but not to corporate aircraft and air taxis, where passengers are at risk. The Pilots claim that this is utterly irrational.

The FAA responds that the distinction between common carriers of passengers and cargo, which are subject to the Age 60 Rule, and private carriers of passengers and cargo, which are not, is found in the governing statute. The Congress directed the FAA to consider the differences between "air transportation," defined as the transportation of passengers or property by a common carrier, 49 U.S.C. §§ 40102(a)(5), (24), & (25), and "other air commerce." *See* 49 U.S.C. § 44701(d)(1)(B). The Congress also specifically required the FAA to consider the duty of air carriers, defined elsewhere as common carriers, 49 U.S.C. §§ 40102(a)(2), (5), (24), & (25), "to provide service with the highest possible degree of safety in the public interest." *See* 49 U.S.C. § 44701(d)(1)(A). Accordingly, the agency considers it appropriate to regulate common carriers more stringently than it regulates "other air commerce." Insofar as that leaves corporate aircraft and air taxis beyond the reach of the Rule, the distinction is not unreasonable, says the agency: corporate pilots do not serve the public as do common carriers; and while air taxis do serve the public, unlike commuter airlines their safety record has not been a source of concern for the FAA or the NTSB, perhaps because their operations—typically involving only a few short haul passengers and less sophisticated equipment—place lesser demands upon their pilots.

We conclude that the FAA adequately explained its decision to apply the Age 60 Rule to pilots of commuter aircraft but not to pilots of corporate aircraft and air taxis. The Congress clearly left the FAA free to regulate corporate aircraft operations at less than the "highest possible degree of safety." *See Quesada,* 276 F.2d at 898 ("The Administrator did not act unreasonably in placing greater limitations on the certificates of pilots flying planes carrying large numbers of passengers who have no opportunity to select a pilot of their own choice. The Federal Aviation Act contemplates just such distinctions between the regulations governing 'air commerce' and those governing other air transportation").

As for excluding air taxi operations while extending the Rule to commuter operations, we accept the FAA's point that the NTSB had asked the agency specifically to consider extending the Rule to commuter operations. 60 Fed.Reg. at 16,235. In responding to the NTSB's request, the FAA was not obliged—contrary to our colleague in dissent, see dissent at 6—to consider whether the Rule might further improve safety if applied to still other operations. Nor, we note, could such an extension of the Rule in any way benefit the petitioners; indeed, as the Seventh Circuit has observed, it would foreclose them from a source of post–60 employment. *See Starr v. FAA,* 589 F.2d 307, 313 (1978).

d. Foreign pilots

■ Finally, the Pilots claim that it is arbitrary and capricious for the FAA to allow a foreign carrier operating in U.S. airspace to employ pilots who are over the age of 60 while prohibiting a U.S. common carrier from employing even the healthiest of pilots beyond that age. The FAA responds that as a signatory of the Chicago Convention, *see* 61 Stat. 1180, T.I.A.S. 1591 (December 7, 1944) the United States is required to recognize as valid any license issued by any other signatory, provided that the requirements underlying such licenses are "equal to or above the minimum standards which may be established from time to time pursuant to this convention." *See* 61 Stat. at 1189; *see also* 49 U.S.C. §§ 40105(b)(1)(A) & (B) (FAA

must "act consistently with obligations of the United States Government under an international agreement," and "shall consider applicable laws and requirements of a foreign country"). The standards that have been established under the Chicago Convention permit (but do not require) a country to allow commercial pilots to fly beyond the age of 60. For this reason, the FAA maintains, it must as a matter of law allow foreign pilots to fly notwithstanding the Age 60 Rule.

We agree with the FAA that the mandate of § 40105 requires this inconsistency in the treatment of domestic and foreign carriers and their pilots. Perhaps, however, experience with foreign pilots over the age of 60 flying commercial aircraft in U.S. airspace will provide the FAA with the comparative data it needs in order to evaluate empirically the continuing need for the existing rule.

3. The weight of the evidence

■ The Pilots assert that the FAA not only placed unwarranted emphasis upon evidence that supports retaining the Rule but also downplayed significant evidence tending to undercut that support. Thus, the FAA stressed that an NIH panel had found in 1981 that pilot performance deteriorates with age while ignoring the same panel's recommendation that selected pilots over the age of 60 be allowed to fly in order to generate data about the performance of older pilots.

The FAA responds that it did not give short shrift to the NIH's recommendation that a limited number of older pilots be allowed to fly in order to generate data. The FAA remains unwilling to act upon this proposal because it knows of no method for selecting a group of low-risk pilots over the age of 60.

We agree with the FAA that it did not ignore the recommendations contained in the 1981 report of the NIH. As we have seen, *see* § II.B.1 above, the FAA decided not to allow pilots to continue flying past the age of 60 because it did not know then, as it does not know now, of any way to identify a group of pilots over the age of 60 who are less likely than other equally venerable aviators to experience some loss of their faculties.

The Pilots also fault the FAA for failing to acknowledge that the NIH has withdrawn its support for the Rule. The Pilots here refer to the declaration of a former director of the National Institute on Aging, Dr. T. Franklin Williams, that he had testified in 1985 before the House Select Committee on Aging "that it was the official position of the NIA that testing of pilots after age 60 was feasible and desirable."

The FAA counters that it did not acknowledge that the Institute had withdrawn its support for the Rule because the record does not establish any such change of position. The only Institute report in the record is the one prepared in 1981. Neither the NIH nor the NIA has conducted another similar study since that time. Only Dr. Williams' declaration, submitted in litigation to which the FAA was not a party and reproduced in the present rulemaking record, is offered in support of the proposition that the NIA "formally abandoned" its earlier position. Moreover, that declaration is in some tension with Dr. Williams' statement before the House Committee on Aging that he did not intend "to speak for or against the retirement age rule," and with his somewhat hesitant assertion that "we can probably reliably test cardiac functioning and with reasonable reliability identify risk for coronary events in older as well as younger persons."

We conclude that the FAA was under no obligation to acknowledge Dr. Williams' post hoc characterization of testimony that was never submitted to the agency. In any event, Dr. Williams did not state in his testimony that the NIH had formally abandoned the earlier study, nor did he give any explanation as to why the NIH would do so. The declaration of Dr. Williams contained no new evidence bearing upon the validity of the Age 60 Rule.

The Pilots also criticize the FAA for rejecting the proposed alternative of screening older pilots through performance checks without acknowledging that the NIH advocates that approach. As discussed above, *see* § II.B.1, the FAA afforded adequate consideration to the merits of this alternative and concluded that medical science has not yet advanced to the point of being able to predict who will experience age-related deterioration. We see no reason why the FAA should be faulted for failing to name the supporters of the proposal as long as the agency adequately considered the merits of the idea. *See Brae Corp. v. United States,* 740 F.2d 1023, 1067 (D.C.Cir.1984) ("Although the Commission has an obligation to identify and ponder all relevant issues, it need not mention by name every commentator whose grievance it examines").

The Pilots also question the FAA's use of the Hilton Study. That study concluded that the available data reveal no increase in the accident rate of pilots nearing age 60, but cautioned that there are no data available with respect to pilots over the age of 60. Acknowledging that the question of when a pilot should be required to retire must be answered "very conservatively because of the possibility of catastrophic results," the study concluded that "one could cautiously increase the retirement age to age 63." The Pilots claim that the FAA did not adequately explain its failure to adopt this recommendation.

The FAA maintains that it regarded the Hilton Study as an inadequate basis upon which to change its policy because the study considered only accident data; a change of policy would have to take account of "data on vision, reaction time, judgment, circadian rhythm and many other neurobehavioral and physiological measures." The FAA also questioned whether it was appropriate to draw an inference about pilots who fly commercial passenger aircraft from statistics pertaining to pilots who fly cargo transports, and therefore have a different flying pattern that may subject them to lesser levels of fatigue and stress; Hilton drew the inference because it lacked more relevant data pertaining to commercial passenger pilots over the age of 60 (a null set).

The FAA may seem to have created something of a Catch-22 by announcing that it will not allow older pilots to fly until it has experiential data demonstrating the continued ability of such pilots to fly safely. On the other hand, it hardly seems reasonable to require that the Administrator periodically put his hand into the fire in order to ensure that he

has precisely assessed the danger that it poses. If the FAA was justified in imposing the Rule in the first place then we cannot say that, simply because it is the Rule itself that blocks the generation of data necessary to reconsider the Rule, it was unreasonable for the FAA to find that it lacks those data. In sum, we hold that the FAA's decision not to convene a rulemaking to revise the Age 60 Rule was not arbitrary and capricious in violation of the APA.

## III. Conclusion

We hold that the ADEA does not limit the authority of the FAA to regulate air carriers in the interest of safety. Because we also conclude that the FAA was not arbitrary and capricious, in violation of the APA, in deciding not to conduct a rulemaking for the purpose of amending the Age 60 Rule, the petitions for review are

*Denied.*

WALD, Circuit Judge, concurring in part and dissenting in part:

The FAA has determined that the progressive anatomic, physiological, and cognitive decline generally associated with aging means that all pilots over the age of 60 represent too great a threat to aviation safety to be allowed to fly in part 121 operations, which constitute by far the bulk of commercial common carrier operations.[1] The FAA based this determination not on evidence demonstrating that pilots over 60 perform less well than pilots under 60, but rather on the claim that there is no accurate means to identify which pilots are particularly at risk of suffering a sudden incapacitation or more subtle deterioration in their abilities and the age of 60 was within the age range where the incidence of diseases associated with aging sharply increases. This argument is essentially the same as that which the FAA offered when it first adopted the Age 60 Rule in 1959. The agency continued to adhere to the position that the Age 60 Rule is necessary to ensure the highest level of aviation safety despite the medical and technological developments over the ensuing nearly four decades, despite a growing trend among foreign aviation authorities to allow pilots over 60 to fly, and despite a recent report commissioned by the FAA which concluded there was no evidence of an increase in accidents associated with older pilots at least up to age 63.

The majority concludes that this decision by the FAA does not violate the Age Discrimination in Employment Act ("ADEA") and satisfies the Administrative Procedure Act's ("APA") prohibition on arbitrary and capricious agency action. I agree that the ADEA does not directly govern the FAA in its role as a regulator, and thus the FAA need not prove that the Age 60 Rule is a bona-fide occupational qualification for pilots. But I believe that the FAA's justification for the rule simply does not pass muster under the APA.[2] It may be the case that our current medical knowledge and testing protocols are unable to identify those older pilots who are at risk of sudden incapacitation or subtle deterioration in functioning, so that an arbitrary across-the-board age limit remains the only reliable means of achieving the highest possible level of aviation safety. However, the FAA has not yet provided an adequate justification on this go-round for its conclusion that this situation still exists, nor for its determination that aviation safety requires all common carrier pilots, even those carrying cargo only, to be subject to the age limit but not corporate or air-taxi pilots. The FAA's decision also suffers from a reliance on flawed and inapplicable studies of accident

1. Up until 1995, part 121 governed common carrier operations involving aircraft with more than 30 seats or more than 7,500 payload capacity. In 1995, the FAA extended part 121 to cover airlines in scheduled passenger carrying operations with 10 to 30 seats and turbojets regardless of seating capacity. *See Commuter Operations and General Certification and Operation Requirements,* 60 Fed.Reg. 65,832 (1995).

2. Although I disagree with the majority's analysis of the FAA's decision under the APA, I concur with the assessment that our usual standard of APA arbitrary and capricious review applies here, even though refusals to initiate rulemaking ordinarily are accorded particular deference by a reviewing court, because the FAA based its refusal to initiate a rulemaking to rescind the Age 60 Rule not on pragmatic resource concerns but on the merits of the rule. *See* Majority opinion ("Op.") at 763–64.

rates. Perhaps hardest to swallow is the FAA's continued refusal to try to obtain medical or performance data on older pilots at the same time as it claims that such evidence is required before any change in the rule can be countenanced. The agency's complacent acceptance of this Catch–22 situation, particularly given that the result is the continuation of a government-imposed regime of age discrimination, seems to me the epitome of arbitrary action.

## I. THE FAA'S FAILURE TO OFFER AN ADEQUATE EXPLANATION OF THE NEED FOR THE AGE 60 RULE

The core of the APA's prohibition on arbitrary and capricious agency action is the requirement that an agency must provide a reasoned explanation for what it does. While "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency," neither may a court sanction agency action when the agency merely offers conclusory and unsupported postulations in defense of its decisions or when it ignores contradictory evidence in the record and fails to justify seeming inconsistencies in its approach. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41, 103 S.Ct. 2856, 2865–66, 77 L.Ed.2d 443 (1983); *accord Dickson v. Secretary of Defense*, 68 F.3d 1396, 1404–05 (D.C.Cir.1995). The FAA's explanation of its

decision to retain the Age 60 Rule suffers from all of these defects.

The FAA currently grants medical exemptions to pilots under 60 who are at risk of sudden incapacitation or subtle deterioration in functioning because of known medical conditions, but refuses to grant exemptions to pilots over the age of 60 who are at risk of these same effects because of aging. In its decision, the FAA argued that this differential treatment of younger pilots and older pilots is merely a reflection of the state of medical technology; according to the FAA, there are tests by which the status of a known cardiovascular or neurological condition can be reliably monitored, but there are no tests by which the presence of such a condition can be reliably determined. The majority accepts this claim as an established fact, but the FAA cites no evidence in its support and it certainly is not intuitively clear why the difference between being at risk of sudden incapacitation or subtle deterioration because of known medical conditions and being at risk of the same effects because of aging should produce radically different diagnostic capacities. *Cf. Baker v. FAA*, 917 F.2d 318, 321 (7th Cir.1990); *see also id.* at 325 (Will, J., dissenting).[3] If the difficulty in the latter instance is the lack of certainty regarding the pilot's health, why not simply presume that the older pilot does in fact suffer from conditions that could cause these effects and then determine whether the pilot is safe to fly by means of the same tests that

---

**3.** In *Baker*, the Seventh Circuit commented that it was not clear "[e]xactly how this distinction [between younger pilots with known conditions and older pilots at risk of the conditions] applies as a practical matter," but upheld the FAA because petitioners were seeking exemptions from the Age 60 Rule and thus bore the "burden [of] present[ing] persuasive evidence that granting exemptions would not impair safety." 917 F.2d at 322. Here, however, petitioners are challenging the rule itself under the APA, and the APA requires the FAA to provide a sufficient explanation demonstrating that its actions are reasonable. *Cf. id.* at 322 n. 6.

Contrary to the majority's thesis, Op. at 764–66, there is nothing in the record to support the idea that it is more difficult to monitor known medical conditions in an older pilot than in a younger pilot; nor is there anything—beyond the FAA's bare assertion that "there are no generally applicable medical tests that can, at this time, adequately determine which individual pilots are

subject to" medical conditions associated with aging, Joint Appendix ("J.A.") at 76—to support the notion that it is harder to diagnose such conditions in the first place in an older than in a younger pilot. The only possible difference is that disabling conditions—whether detected or not—may be more likely to occur in older than in younger pilots. *But see infra* note 4 (FAA's evidence is ambiguous on question of whether age 60 is the appropriate cut-off to guard against age-related decline). Yet without evidence that such conditions are more easily detected in younger pilots, this potential difference does not suffice to justify the FAA's Age 60 Rule. Indeed, common sense suggests that examining physicians would be more likely to suspect, check for, and thus discover disabling conditions in the older pilots. Even if that were not the case, however, the possibility that older pilots are more subject to disabling medical conditions than younger pilots could be readily addressed by more frequent and thorough medical testing.

are used to monitor pilots with known conditions?

Nor can the FAA's differential treatment of older and younger pilots be explained on the grounds that the age-related conditions that pose a concern in regard to older pilots are different from those found in younger pilots. The record makes clear that the FAA allows younger pilots to fly who have been diagnosed with cardiovascular disease, even though it also lists cardiovascular disease as one of the potential causes of sudden incapacitation and subtle deterioration in older pilots. *Age 60 Rule,* 60 Fed.Reg. at 65,983–84. In any event, it is the potential effects of the medical conditions associated with aging, and not the conditions *per se,* that pose a risk to aviation safety, and the FAA allows younger pilots to fly with conditions that could produce the same effects. For example, while the FAA puts great emphasis on the subtle decline in cognitive functioning that accompanies aging, the FAA allows younger pilots to fly with various conditions, such as neurological and psychological disorders or alcoholism, that potentially could undermine a pilot's cognitive abilities. J.A. 206, 284, 611–12, 678. The FAA nowhere explains why the same tests that it employs to assess whether younger pilots with these conditions possess the level of cognitive functioning required to fly safely cannot be used to make the same determination regarding older pilots.[4]

The FAA's failure to explain adequately its different treatment of younger pilots and older pilots when both are at risk of sudden incapacitation or subtle deterioration in functioning is not simply a minor deficiency in its analysis. The heart of the FAA's defense of the Age 60 Rule is its claim that medical knowledge does not provide a means by which those pilots at risk of these effects can be accurately identified. If the tests that the FAA currently uses to monitor younger pilots with known conditions that might cause such effects could be used to monitor older pilots at risk of these conditions, then there would be no need for the rule.

A similar lack of reasoned analysis characterizes the FAA's explanation of the scope of the Age 60 Rule. The rule currently applies to all part 121 pilots, including part 121 pilots that work solely in cargo operations. It also applies *only* to part 121 pilots; other pilots— such as corporate pilots, test pilots, inspectors, and air-taxi pilots—are not covered. The FAA, defending its application of the Age 60 Rule to all and only part 121 operations, noted simply that Congress required the FAA in promulgating safety regulations to consider the duty of air carriers, which transport passengers or property by aircraft as a common carrier, to perform their services with the highest possible degree of safety in the public interest and to take account of the differences between air carriers and other forms of air commerce. *See Age 60 Rule,* 60 Fed.Reg. at 65,985. According to the majority, this statement suffices to explain the FAA's refusal to apply the Age 60 Rule to non-air carrier pilots, such as corporate pilots, because "Congress clearly left the FAA free to regulate corporate aircraft operations at less than the highest possible degree of safety." Op. at 768. But even if Congress did not require the highest possible degree of safety for non-air carrier operations, it did authorize the FAA to prescribe regulations that the FAA "finds necessary for safety in air commerce operations." 49 U.S.C. § 44701(a)(5) (1994). Thus, what is needed before we can conclude that the

---

4. In addition, if the possibility of an age-related cognitive decline is to be the linchpin of the FAA's defense of the Age 60 Rule, then the agency should provide a more in-depth discussion than it currently does of why 60 is an appropriate age cut-off to guard against this phenomenon. In its decision the FAA identifies the phenomenon of age-related cognitive decline, but provides no indication of when such decline impacts on an individual's ability to function. The decision also comments that "[o]ne in 10 persons over age 65 and nearly half of those over 85 have Alzheimer's disease alone, and increasingly it is found in people in their 40's and 50's." J.A. at

72. Without any indication of whether the incidence of Alzheimer's increases with age before 65, this statement does not support an across-the-board age cutoff of 60. *See also* Institute of Medicine, *Airline Pilot Age, Health and Performance: Scientific and Medical Considerations,* J.A. at 215 (noting that the prevalence of dementia before 65 has been estimated at 1 percent, while the prevalence after 65 has been estimated at 5 percent); J.A. at 638–41 (affidavit of former Director of National Institute on Aging arguing that evidence on neurological and neuropsychological health does not support an age cut-off of 60).

FAA's exclusion of non-air carrier operations from the Age 60 Rule is reasonable is some explanation as to why the rule is not required to achieve the level of safety that the FAA believes is appropriate for non-air carrier operations. Such an explanation is not to be found anywhere in the FAA's decision.

Further, the FAA's citation of the duty of air carriers to operate with the highest possible degree of safety does not explain why the FAA applies the Age 60 Rule to some but not all air carriers. At the same time as it issued its decision refusing to rescind the Age 60 Rule, the FAA also promulgated a final regulation extending the rule to commuter operations as part of a shift of most commuter airlines to part 121. However, as applied to commuter operations the Age 60 Rule will not be fully effective for four years. The FAA justified this four year delay in terms of the burden the rule would impose on commuter airlines and commuter pilots; it emphasized that commuter airlines have invested money in training pilots in the expectation they could fly past 60 and will be subject to numerous other new regulations in the immediate future as a result of the shift to part 121, while commuter pilots have not planned on leaving their positions at 60. These are all sensible reasons to delay enforcement of the Age 60 Rule, but they are difficult to reconcile with the FAA's citation of the duty of air carriers to perform with the highest degree of safety in defending the application of the rule to all part 121 operations. Why, if this duty does not allow the FAA room to consider the differences between cargo and passenger operations or the burden on pilots under part 121, does it allow the FAA to take economic and fairness concerns into account in regard to commuter operations?

The FAA also provides no explanation for why duty to perform with the highest degree of safety possible is consistent with the continued exclusion from the Age 60 Rule of air-

taxis, which are air carriers but not regulated under part 121. The FAA's only reference to air-taxis comes not in its age 60 decision but in its proposal to shift commuter operations to part 121, and consists merely of the statement that air-taxis "are unlike commuter or major air carrier operations," along with the comment that the FAA was only asked to put commuter operations under part 121. *See Commuter Operations and General Certification and Operations Requirements,* 60 Fed.Reg. 16,230, 16,235 (1995). The majority maintains that the exclusion of air-taxi operations from the Age 60 Rule is reasonable simply because the FAA was not asked to extend the rule to such operations. I find this argument wholly unpersuasive and wide of the mark. The question is not whether the rule should be extended to air-taxi operations, but rather whether the FAA's application of the rule to all air carrier operations coming under part 121 was reasonable. Given that its defense of the application of the Age 60 Rule to all part 121 operations was simply a citation of the air carrier's heavy duty of safety, the FAA has an obligation to provide some explanation as to why this duty does not require non-part 121 air carrier operations to be subject to the Age 60 Rule as well.[5]

A third deficiency in the FAA's decision is its reliance on flawed and inapplicable studies of accident rates. As the majority details, one instigating factor behind petitioners' request for a rulemaking on the Age 60 Rule was the 1993 Hilton report on the relationship between pilot age and accident rates. This report, commissioned by the FAA, determined that there was no evidence of increased accident rates for air carrier pilots as they neared 60, and if anything a slight downward trend. Based on its analysis of pilots over the age of 60 flying in operations not covered by the Age 60 Rule, the report concluded that the age limit for part 121 pilots could be extended from 60 to 63. The

---

**5.** The majority also remarks that extension of the Age 60 Rule to air-taxi operations would not benefit petitioners, since it would only further restrict the opportunities available to pilots over the age of 60. But again, the petitioners' challenge is to the FAA's claim that the duty of air carriers to perform with the highest degree of safety is a sufficient basis to justify application of

the rule to all part 121 operations, not to the FAA's exclusion of air-taxi and other non-part 121 air carrier operations from the rule. If the FAA were to determine that the differences between different types of part 121 operations allowed pilots over the age of 60 to fly in some instances, more opportunities for older pilots would be created.

FAA concluded, however, that the Hilton report did not justify rescission of the Age 60 Rule or an increase in the age cutoff.

The FAA based its rejection of the Hilton report in large part on the fact that earlier studies had found an increase in accident rates. But the record indicates that many of these studies are seriously flawed. For example, the FAA described in great detail the conclusions of a 1983 report that found a substantially higher accident rate for pilots over 60 than for younger pilots. While the FAA noted that several commentators disagreed with the methodology used in this report, it never explained why, despite these methodological problems, the 1983 report retained any evidentiary value. As the Seventh Circuit commented, these problems—such as including millions of nearly accident free air carrier miles in determining the accident rate for pilots under 60 even though as a result of the Age 60 Rule no air carrier miles are available in determining the accident rate for pilots over 60, and calculating a single accident rate for all pilots in a ten year cohort—mean that the 1981 report is, at best, of "very limited usefulness." *Baker*, 917 F.2d at 320–21 & n. 1; *accord* J.A. at 100–01, 659; *see also* J.A. at 101–02, 500–01, 518–20 (criticisms of the Office of Technology Assessment report and the second Golasewski report). The FAA also relies on a National Research Council report that found car accident rates increased for older drivers, arguing that the lack of part 121 pilots flying past 60 necessitated the use of surrogate data to assess the performance of older pilots and that car accident data was a relevant comparison because both flying and driving a car require good reflexes and judgment. But, again as the Seventh Circuit has noted, "[t]he connection between automobile drivers and pilots itself seems tenuous given the pilots' training, demonstrated proficiency, medical fitness, etc." *Baker*, 917 F.2d at 321; *see also* J.A. at 504. The FAA does not acknowledge these differences or explain why, even so, car accident data is relevant.

## II. THE NEED FOR EVIDENCE ON OLDER PILOT SAFETY AND THE FAA'S REFUSAL TO OBTAIN IT

These deficiencies in the FAA's justifications for the Age 60 Rule lead me to conclude that the FAA's decision to retain the rule fails the reasoned decisionmaking requirements of the APA. Even without them, I believe that the FAA's refusal to try and obtain the evidence it claims is necessary to rescind the rule would require us to hold that its decision was arbitrary.

In its decision, the FAA emphasizes that what is required before a conclusive assessment of the contribution of the Age 60 Rule to protect aviation safety can be reached is medical and performance data on pilots over 60 serving in air carrier operations. The importance of such data was also underscored by the National Institutes of Health ("NIH") in its 1981 report on the Age 60 Rule, and the need for such directly relevant data is hard to deny. But the FAA simultaneously refuses to allow any over–60 pilots whose performance and health could be studied to generate this data to fly in air carrier operations, even pilots who have been subjected to rigorous medical and performance screening. The FAA defended its refusal to allow such a study of older pilots on the basis of the same argument that it uses to justify retention of the Age 60 Rule in general—namely that there is no reliable means for selecting pilots to participate in the study who were not at risk of sudden incapacitation or subtle deterioration in their abilities, and in the absence of such selection tests the study would represent too great a threat to aviation safety.

The flaws in the FAA's reasoning discussed above make it difficult to credit the FAA's conclusion that such a study would pose an unacceptable risk to aviation safety. If accommodating the reasonable expectation of commuter airlines and commuter pilots justifies delaying application of the Age 60 Rule to commuter operations, then surely the pressing need for data on older pilot health and performance justifies allowing a carefully screened group of pilots to fly past 60 as part of a systematic study of older pilots. And the FAA's contention that there is no means by which to safely select participants for such a study is undercut by the agency's claim that it can safely monitor younger pilots with

known conditions that could result in sudden incapacitation or subtle deterioration in functioning. In addition, many experts who study the Age 60 Rule have argued that a carefully screened group of over 60 pilots could safely be allowed to fly as part of a systematic study. For example, the NIH report, which the FAA itself describes as "the most comprehensive study yet performed of the issues involved in age-related retirement of airline pilots," *Age 60 Rule*, 60 Fed.Reg. at 65,982, recommended that the FAA undertake such a program and provided a general description of what would be required. Thus, clearly the authors of the NIH report, who were national experts on the medical conditions associated with aging, believed that such a study could be safely undertaken. *See* J.A. at 179–81; *see also id.* at 471–73 (testimony of Dr. James Hickman of the Mayo Clinic to the same effect); *see generally* Andreas E. Struck et al., *Multidimensional Risk Assessment versus Age as Criterion for Retirement of Airline Pilots*, 40 J. AM. GERIATRIC SOC'Y. 526, 530 (1992) (arguing that under an improved medical certification procedure conditions that might cause sudden incapacitation or subtle deterioration in functioning "would most likely be identified" and advocating an increase in the mandatory retirement age for pilots to 70), *reprinted in* J.A. at 622; Charles E. Drebing et al., *Early Detection of Cognitive Decline in Higher Cognitively Functioning Older Adults*, 8 NEUROPSYCHOLOGY No. 1, 31, 35 (1994) (analyzing data on a battery of tests designed to screen for cognitive decline and concluding that the battery "exhibits a relatively high degree of accuracy").

In any event, recent developments make it possible for the FAA to obtain medical and performance data from pilots flying in part 121 operations. Europe's Joint Aviation Authority as well as several Asian countries now permit pilots to fly past age 60, and by treaty these pilots must be allowed to fly in U.S. airspace. As the majority notes, this fact creates a natural source of exactly the sort of information on older pilots that is needed. Another seemingly valuable source of data on pilot functioning are commuter pilots over 60 who will be allowed to fly for four years after commuter operations are shifted under part 121. A third potential source is non-part 121 operators who have agreed to allow pilots to fly past 60 pursuant to consent decrees with the Equal Employment Opportunity Commission. At no point in its decision, however, does the FAA suggest that it will make any efforts to obtain data on older pilot functioning from any of these sources.

Ordinarily, an agency's failure to try and obtain data needed to initiate a rulemaking would not be arbitrary; agencies must be allowed to set their own agendas and allocate their resources as they see fit. *Cf. Heckler v. Chaney*, 470 U.S. 821, 831–32, 105 S.Ct. 1649, 1655–56, 84 L.Ed.2d 714 (1985). But circumstances surrounding the FAA's retention of the Age 60 Rule are not ordinary. For nearly forty years, the FAA has argued that the Age 60 Rule is necessary to ensure the highest level of aviation safety but it has yet to supply the direct evidence of older pilot health and performance that is needed to support this proposition. *See, e.g., Aman v. FAA*, 856 F.2d 946, 948 (7th Cir.1988) (commenting that "the agency's progress in developing an understanding of the relationship between aging and flight performance has been disappointing"). The Age 60 Rule also exacts substantial costs; pilots are forced to end their careers even though they are healthy and perfectly able to fly and the flying public is deprived of the valuable expertise that these pilots offer. These costs do not on their own make the Age 60 Rule unreasonable, since they may be unavoidable if aviation safety is to be assured only in this way, but their presence makes it incumbent on the FAA to try to obtain the evidence required to fully and accurately assess the need for the Age 60 Rule.

Most importantly, the Age 60 Rule stands as an instance of government-mandated age discrimination for a particular group of employees. The ADEA manifests our country's rejection of measures that discriminate against individuals solely because of their age; its stated purpose was to "promote employment of older persons based on their ability rather than age ... [and] to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621(b). As I indicated earlier, I

do not believe that the ADEA directly governs the FAA in its role as a regulator of aviation such as to make it necessary for the FAA to demonstrate that the Age 60 Rule is a bona-fide occupational qualification and therefore acceptable under the Act. But this does not mean that the FAA can ignore the ADEA altogether. The congressional condemnation of age discrimination embodied in the ADEA imposes a duty on the FAA to try to obtain data that might allow it to do away with its current reliance on an arbitrary across-the-board age cutoff as a method of ensuring aviation safety.[6]

### III. CONCLUSION

Judges must be ever-vigilant to ensure that when enforcing the APA's requirement of reasoned decisionmaking they defer to agency expertise. The importance of such deference is most acute in regard to safety determinations, given the potential catastrophic effects of inadequate safety regulations, and it is difficult to imagine an agency decision which judges would be more disposed to accept than one that implicates aviation safety. However, deference to agency expertise cannot be allowed to become toleration of arbitrary agency action—or in this case inaction—even in an area as critical as aviation safety. Because I believe the FAA has failed to provide a reasoned explanation for its decision to retain the Age 60 Rule, I would remand to the agency for further proceedings.

---

**6.** A rider to the 1996 appropriations bill prohibited the National Transportation Safety Board from expending any funds to study the performance of pilots over 60. *See* Department of Transportation and Related Agencies Appropriations Act of 1997, Pub.L. No. 104–205, § 345, 110 Stat. 2951, 2976 (1996). But this rider was not in effect when the FAA rendered its decision, and thus is irrelevant to a determination of whether the FAA's failure to undertake measures to obtain data on older pilot functioning was reasonable.