137 F.3d 398
 7 A.D. Cases 1571, 12 NDLR P 23
 The ESTATE OF William C. MAURO, By and Through its
independent personal representative, Sandra MAURO,
Plaintiff-Appellant,
v.
BORGESS MEDICAL CENTER, a Michigan Not For Profit
Corporation, Defendant-Appellee.
 No. 95-1544.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 10, 1996.
Decided Feb. 25, 1998.
 
 Edward J. Annen, Jr. (argued and briefed), William C. Mauro, pro se, Kalamazoo, MI, for Plaintiff-Appellant.
 Craig H. Lubben (argued and briefed), Nancy Stevenson Rubino (briefed), Miller, Johnson, Snell & Cummiskey, Kalamazoo, MI, for Defendant-Appellee.
 Before: BOGGS, NORRIS, and GIBSON,* Circuit Judges.
 JOHN R. GIBSON, J., sitting by designation, delivered the opinion of the court, in which ALAN E. NORRIS, J., joined. BOGGS, J. (pp. 407-16), delivered a separate dissenting opinion.OPINION
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 William C. Mauro brought an action against his former employer, Borgess Medical Center, alleging violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (1994), and the Rehabilitation Act, 29 U.S.C. §§ 701-796 (1994).[1] The district court[2] granted Borgess's motion for summary judgment, determining that Mauro, who was infected with human immunodeficiency virus, or HIV, the virus that causes AIDS, was a direct threat to the health and safety of others that could not be eliminated by reasonable accommodation and thus concluded that Borgess took no illegal action in removing Mauro from his position as surgical technician. See Mauro v. Borgess Med. Ctr., 886 F.Supp. 1349 (W.D.Mich.1995). Mauro[3] appeals, arguing that as a surgical technician at Borgess he did not pose a direct threat to the health and safety of others and that therefore the district court erred in granting summary judgment to Borgess. We affirm.
 
 
 2
 Borgess employed Mauro from May 1990 through August 24, 1992 as an operating room technician. In June of 1992, an undisclosed source telephoned Robert Lambert, Vice President of Human Resources for Borgess Medical Center and Borgess Health Alliance, and informed Lambert that Mauro had "full blown" AIDS. Because of Borgess's concern that Mauro might expose a patient to HIV, Georgiann Ellis, Vice President of Surgical, Orthopedic and Clinical Services at Borgess, and Sharon Hickman, Mauro's supervisor and Operating Room Department Director, created a new full-time position of case cart/instrument coordinator, a position that eliminated all risks of transmission of the HIV virus. In July of 1992, Borgess officials offered Mauro this position, which he refused.
 
 
 3
 After Mauro's refusal of the case cart/instrument coordinator position, Borgess created a task force to determine whether an HIV-positive employee could safely perform the job responsibilities of a surgical technician. Lambert and Ellis informed Mauro by a letter dated August 10, 1992, that the task force had determined that a job requiring an HIV-infected worker to place his or her hands into a patient's body cavity in the presence of sharp instrumentation represented a direct threat to patient care and safety. Because the task force had concluded that an essential function of a surgical technician was to enter a patient's wound during surgery, the task force concluded that Mauro could no longer serve as a surgical technician. Lambert and Ellis concluded by offering Mauro two choices: to accept the case cart/instrument coordinator position, or be laid off. Mauro did not respond by the deadline stated in the letter, and Borgess laid him off effective August 24, 1992. Mauro filed this suit in January 1994.
 
 
 4
 Borgess moved for summary judgment arguing that it was entitled to remove Mauro from his position since his HIV-positive condition posed a direct threat to the health and safety of others under the four-factor test outlined in School Board v. Arline, 480 U.S. 273, 287-88, 107 S.Ct. 1123, 1130-31, 94 L.Ed.2d 307 (1987). Arline 's factors include the nature, duration, and severity of the risk, and the probability that the disease will be transmitted. Id. The district court considered the relevant medical and scientific evidence, as well as the other affidavits and depositions before it. Observing that the parties had agreed that the first three factors of the Arline test indicated that Mauro posed a significant threat to others, the court focused on the probability that the disease would be transmitted, the fourth element of the Arline test. Mauro, 886 F.Supp. at 1352-53.
 
 
 5
 Mauro argued that the probability of transmitting his HIV virus was so small that the risk was not cognizable and introduced expert testimony to support his argument. The court referred to Mauro's deposition and recognized that Mauro was "occasionally required to place his hands upon and into the patient's surgical incision to provide room and visibility to the surgeon." Id. at 1352. The court then determined that Mauro's experts had admitted that it would present a direct risk if a surgical technician was required to place his or her hands into a surgical incision and was exposed to the risk of needle sticks and lacerations. Id. at 1353. In addition, the court emphasized that Mauro had testified that he was always exposed, during surgery, to the possibility of sustaining a needle stick or minor laceration. In fact, Mauro had sustained two such injuries during his employment as a surgical technician.
 
 
 6
 Next, the court held that Doe v. University of Maryland Medical System Corp., 50 F.3d 1261 (4th Cir.1995), and Bradley v. University of Texas M.D. Anderson Cancer Center, 3 F.3d 922 (5th Cir.1993) (per curiam), cert. denied, 510 U.S. 1119, 114 S.Ct. 1071, 127 L.Ed.2d 389 (1994), two decisions involving HIV-positive health care workers that held that the workers posed a direct risk to the health and safety of others, were "materially indistinguishable and properly reasoned."
 
 
 7
 Applying the reasoning of the Fourth and Fifth Circuits, the district court concluded as a matter of law that Mauro's presence in the operating room in the capacity of a surgical technician posed a direct and significant threat to the health and safety of others. In light of these decisions and the specific duties of a Borgess surgical technician, the court held that Mauro posed a direct risk to the health and safety of others and held that no genuine issue of material fact existed, and therefore granted summary judgment in favor of Borgess.
 
 
 8
 The court next rejected Mauro's argument that his direct contact with a patient was not an essential function, but rather a marginal function of his position. Because an employer is not required to restructure the essential functions of a position, the district court concluded that reasonable accommodation was not possible and held that Borgess had done all that was required under the Americans With Disabilities Act and the Rehabilitation Act. The other aspects of the district court's decision are not relevant to this appeal.
 
 I.
 
 9
 We review a grant of summary judgment de novo. See Roush v. Weastec, Inc., 96 F.3d 840, 843 (6th Cir.1996). Courts properly grant summary judgment where the moving party establishes through pleadings, depositions, answers to interrogatories, admissions, and affidavits that "there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In addition, the movant can meet its burden by pointing out an absence of evidence to support an essential element of a claim for which the nonmoving party bears the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the nonmoving party presents evidence from which a jury might return a verdict in its favor, a court may not grant summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S.Ct. 2505, 2514-15, 91 L.Ed.2d 202 (1986). The court, in considering a motion for summary judgment, must accept the evidence of the nonmoving party and draw all reasonable inferences in the nonmovant's favor. See id. at 255, 106 S.Ct. at 2513-14. We view the facts and any reasonable inferences drawn from those facts in a light most favorable to the nonmoving party. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).
 
 II.
 
 10
 Mauro argues that the district court erred in concluding that there was no genuine issue of material fact about whether the likelihood of him transmitting HIV in the course of his job posed a significant risk or direct threat to the health and safety of others, thus rendering him unqualified.
 
 
 11
 Mauro's first claim alleges that Borgess discriminated against him in violation of section 504 of the Rehabilitation Act, which provides that no otherwise qualified individual with handicaps shall, solely by reason of his or her handicap, be excluded from participation in, or be denied benefits of any program receiving federal financial assistance. See 29 U.S.C. § 794.
 
 
 12
 Through the passage of the Rehabilitation Act, Congress intended to protect disabled individuals "from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns ... as avoiding exposing others to significant health and safety risks." Arline, 480 U.S. at 287, 107 S.Ct. at 1131. Arline specifically noted:
 
 
 13
 Few aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness.... The Act is carefully structured to replace such reflexive reactions to actual or perceived handicaps with actions based on reasoned and medically sound judgments.... The fact that some persons who have contagious diseases may pose a serious health threat to others under certain circumstances does not justify excluding from the coverage of the Act all persons with actual or perceived contagious diseases. Such exclusion would mean that those accused of being contagious would never have the opportunity to have their condition evaluated in light of medical evidence.... Rather, they would be vulnerable to discrimination on the basis of mythology--precisely the type of injury Congress sought to prevent.
 
 
 14
 Id. at 284-85, 107 S.Ct. at 1129-30 (footnote omitted).
 
 
 15
 In order to recover under the Rehabilitation Act, a plaintiff must establish that he or she is "otherwise qualified" to do the job within the meaning of the Act. An "otherwise qualified" person is one who can perform the "essential functions" of the job at issue. See 45 C.F.R. § 84.3(k) (1996); Arline, 480 U.S. at 287-88 n. 17, 107 S.Ct. at 1131 n. 17. In a situation regarding the employment of a person with a contagious disease, the inquiry should also include a determination of whether the individual poses "a significant risk of communicating the disease to others in the workplace." Arline, 480 U.S. at 287-88 n. 16, 107 S.Ct. at 1131 n. 16.
 
 
 16
 Mauro's second claim alleges that Borgess discriminated against him in violation of the Americans with Disabilities Act, which provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services of public entities. See 42 U.S.C. § 12132.
 
 
 17
 To prevail under his Americans with Disabilities Act claim, Mauro must show that he is "otherwise qualified" for the job at issue. See University of Md., 50 F.3d at 1266. A person is "otherwise qualified" if he or she can perform the essential functions of the job in question. See Bradley, 3 F.3d at 924. A disabled individual, however, is not "qualified" for a specific employment position if he or she poses a "direct threat" to the health or safety of others which cannot be eliminated by a reasonable accommodation. See 42 U.S.C. § 12111(3); University of Md., 50 F.3d at 1265.
 
 
 18
 The "direct threat" standard applied in the Americans With Disabilities Act is based on the same standard as "significant risk" applied by the Rehabilitation Act. See H.R.Rep. No. 101-485, pt. 3, at 45 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 468; University of Md., 50 F.3d at 1264 n. 9; Doe v. District of Columbia, 796 F.Supp. 559, 567 n. 11 (D.D.C.1992). Our analysis under both Acts thus merges into one question: Did Mauro's activities as a surgical technician at Borgess pose a direct threat or significant risk to the health or safety of others?
 
 
 19
 Arline laid down four factors to consider in this analysis:
 
 
 20
 (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.
 
 
 21
 480 U.S. at 288, 107 S.Ct. at 1131 (citations omitted).
 
 
 22
 To show that one is "otherwise qualified", neither Act requires the elimination of all risk posed by a person with a contagious disease. In Arline the Supreme Court determined that a person with an infectious disease "who poses a significant risk of communicating an infectious disease to others in the workplace," is not otherwise qualified to perform his or her job. Id. at 287-88 n. 16, 107 S.Ct. at 1131 n. 16. If the risk is not significant, however, the person is qualified to perform the job. The EEOC guidelines provide further insight:
 
 
 23
 An employer, however, is not permitted to deny an employment opportunity to an individual with a disability merely because of a slightly increased risk. The risk can only be considered when it poses a significant risk, i.e. high probability, of substantial harm; a speculative or remote risk is insufficient.
 
 
 24
 29 C.F.R. § 1630.2(r) (1996) (citations omitted). The legislative history further supports the premise that the risk does not have to be eliminated. "The plaintiff is not required to prove that he or she poses no risk." H.R.Rep. No. 101-485, pt. 3, at 46 (1990), reprinted in 1990 U.S.C.C.A.N. at 469. Thus, our analysis in the instant case must not consider the possibility of HIV transmission, but rather focus on the probability of transmission weighed with the other three factors of the Arline test.
 
 III.
 
 25
 The parties agree that the first three factors of the Arline test: the nature, duration, and severity of the risk, all indicate that Mauro posed a significant risk to others. Mauro argues, however, that because the probability of transmission, the fourth factor of Arline, was so slight, it overwhelmed the first three factors and created a genuine issue of material fact.
 
 
 26
 In determining whether Mauro posed a significant risk or a direct threat in the performance of the essential functions of his job as a surgical technician, Arline instructs that courts should defer to the "reasonable medical judgments of public health officials." 480 U.S. at 288, 107 S.Ct. at 1131; see also Abbott v. Bragdon, 107 F.3d 934, 944-45 (1st Cir.), cert. granted in part, --- U.S. ----, 118 S.Ct. 554, 139 L.Ed.2d 396 (1997). The Centers for Disease Control is such a body of public health officials. See University of Md., 50 F.3d at 1266; Bradley, 3 F.3d at 924; 28 C.F.R. Pt. 36, Subpart B § 36.208 (1996). The Centers for Disease Control has released a report discussing its recommendations regarding HIV-positive health care workers. See Centers for Disease Control, U.S. Dep't of Health & Human Servs., Recommendations for Preventing Transmission of Human Immunodeficiency Virus and Hepatitis B Virus to Patients During Exposure-Prone Invasive Procedures, 40 Morbidity & Mortality Weekly Report, 1, 3-4 (July 12, 1991).
 
 
 27
 The Report states that the risk of transmission of HIV from an infected health care worker to a patient is very small, and therefore recommends allowing most HIV-positive health care workers to continue performing most surgical procedures, provided that the workers follow safety precautions outlined in the Report. See id. at 5; University of Md., 50 F.3d at 1263. The Report, however, differentiates a limited category of invasive procedures, which it labels exposure-prone procedures, from general invasive procedures. See Recommendations, at 3-4. General invasive procedures cover a wide range of procedures from insertion of an intravenous line to most types of surgery. See University of Md., 50 F.3d at 1263. Exposure-prone procedures, however, involve those that pose a greater risk of percutaneous (skin-piercing) injury. Though the Centers for Disease Control did not specifically identify which types of procedures were to be labeled exposure-prone, it supplies a general definition: "Characteristics of exposure-prone procedures include digital palpation of a needle tip in a body cavity or the simultaneous presence of the [health care worker's] fingers and a needle or other sharp instrument or object in a poorly visualized or highly confined anatomic site." Recommendations at 4. The Report advises that individual health care institutions take measures to identify which procedures performed in their hospital should be labeled exposure-prone and recommends that HIV-infected health care workers should not perform exposure-prone procedures unless they have sought counsel from an expert review panel and have been advised under what circumstances they may continue to perform these procedures. The Report further recommends that those health care workers who engage in exposure-prone procedures notify prospective patients of their condition. See id. at 5.
 
 
 28
 We must defer to the medical judgment expressed in the Report of the Centers for Disease Control in evaluating the district court's ruling on whether Mauro posed a direct threat in the essential functions of his job.
 
 
 29
 Mauro stated in his deposition that during surgery his work did not include assisting in surgery, but instead handing instruments to the surgeon and helping the surgeon with whatever else he or she needed. During surgery, Mauro would at times hold a retractor with one hand in the wound area, and pass instruments as needed with his other hand. When asked if he would be actually inside a wound holding a retractor, Mauro answered "Me personally, no." But when questioned further about his hands in the wound area, he stated: "Usually if I have my hands near the wound, it would be to like, on an abdominal incision, to kind of put your finger in and hold--kind of pull down on the muscle tissue and that--where the two met in like a V shape at the bottom and the top, and pull that back. But it happened very, very rarely because they had retractors to do that." The purpose of this action was to give the surgeon more room and more visibility.
 
 
 30
 The continued questioning led to a distinction between the wound and the body cavity. Mauro was asked if he ever had his hands in a body cavity, described as being past the wound area, and Mauro stated that he personally never had his hand in a body cavity because the small size of the surgical incision prevented too many hands from being placed inside the body cavity.[4]
 
 
 31
 Mauro was also questioned about the work of other surgical technicians at Borgess. When asked if other surgical technicians would have their hands in a wound, he could not give a definite answer because he did not work with other surgical technicians. Mauro further testified that he was told that some hospitals have their technicians assist, and that therefore no distinctions existed between the duties of surgical technicians and surgical assistants. Mauro believed, however, that Borgess did not allow technicians to assist because of union requirements, but he was not sure if this was correct.
 
 
 32
 Mauro explained that during his training, discussion had occurred indicating that nicks and cuts were always a possibility for a surgical technician. In fact, the record included two incident reports involving Mauro. One report indicated that Mauro had sliced his right index finger while removing a knife blade from a handle on June 25, 1991, and another report indicated that he had scratched his hand with the sharp end of a dirty needle while threading it on June 8, 1990.
 
 
 33
 Mauro further stated in his deposition that when Dr. Mark DeYoung, his family physician, first expressed concern that Mauro might have the HIV virus, he was of the impression that Mauro should refrain from working in surgery because of the possibility of a needle stick. Dr. DeYoung referred Mauro to Dr. David Davenport, an infectious disease specialist.
 
 
 34
 After examining Mauro, Dr. Davenport wrote a letter to Dr. DeYoung. The letter quoted Mauro as telling Dr. Davenport that he double gloved and wore orthopedic gloves when he worked, but that he still suffered cuts and needle sticks frequently with his job. Dr. Davenport's letter expressed concerns about Mauro's current job, but stated that he had told Mauro that the current consensus was that infected health care workers could continue to work in the surgical field provided that they had no underlying illnesses and used extraordinary care in their work. Dr. Davenport concluded by stating that he had suggested to Mauro that he may want to seek another type of job at Borgess that did not involve continuous direct exposure to blood and eventual needle sticks.
 
 
 35
 Dr. Davenport testified in his deposition that even if HIV-infected health care workers followed universal precautions, methods designed to ensure that health care workers do not come into contact with blood, some risk of exposure existed when HIV-infected health care workers come into contact with patients. Dr. Davenport stated that this can happen because of human error, as health care workers would not completely follow the precautions; through needle injuries; and because there was always potential for blood exposure in situations that could not be controlled, such as when surgical gloves tore.
 
 
 36
 Dr. Davenport identified the Centers for Disease Control Report as one of the best resources available on preventing transmission of the HIV virus. He stated that he was familiar with the theoretical model estimating that the risk of a patient being infected by an HIV-positive surgeon during a single operation as being somewhere between one in 42,000, and one in 420,000. He further stated that any patient who comes in contact with the HIV-infected blood of a health care worker has some risk of the virus being transferred to that patient. Though a few people infected with HIV suffer no consequences, Dr. Davenport stated that in general most people consider HIV a uniformly lethal disease. Dr. Davenport agreed that if a job required an HIV-infected worker to place his or her hands into a patient's body cavity in the presence of sharp instrumentation, it represented a real risk to patient care and safety because it could result in blood to blood contact which could lead to the transmission of the AIDS virus.[5]
 
 
 37
 Sharon Hickman, a registered nurse, was the interim director of operating rooms at Borgess in June and July of 1992. While serving as interim director Hickman supervised the surgical technicians at Borgess, including Mauro. In her affidavit Hickman described a meeting of the Ad Hoc HIV Task Force for the hospital on July 23, 1992 and the statements she made at that meeting. Hickman stated that she told the task force that the duties of a surgical technician include preparing and maintaining the equipment used during surgery, but that:
 
 
 38
 on an infrequent basis, the Surgical Technician is required to assist in the performance of surgery by holding back body tissue, with the use of either retractors or the Technician's hands, to assist the surgeon in visualizing the operative site. The Surgical Technician also may assist the surgeon with suturing and other duties related to the performance of the operation.
 
 
 39
 She also advised the task force that, although the need for a surgical technician's assistance in the performance of a surgical procedure arises infrequently, it is not possible to restructure the job to eliminate the surgical technician from performing such functions because this need arises on an emergency basis and cannot be planned in advance. In some cases, particularly on off-shifts, Hickman stated that the surgical technician is required to assist at the surgery because a registered nurse or surgical assistant is not available. In other surgical proceedings a nurse or surgical assistant may be present, but due to the complexity or other unexpected requirements of the procedure, another pair of hands may be needed in the operative site, and the surgical technician is then required to assist. Most often, the surgical technician is required to assist in the operative site because more hands are needed to visualize the surgical area. Finally, Hickman stated that Mauro had been involved in two incidents during the course of his employment, one of which might have resulted in patient exposure.
 
 
 40
 Dr. Steven C. Ross, who attended the July 23 meeting of the Ad Hoc HIV Task Force, confirmed in his affidavit that during the meeting Hickman had made the statements as she had described in her affidavit. Dr. Ross further stated that he had informed the task force that an HIV-positive health care worker posed minimal risk to patients if the worker was not required to place his or her hands in close proximity to sharp instrumentation in a confined or poorly visualized site. When the worker is required to assist in a surgical procedure by placing his or her hands in a body cavity in close proximity to sharp instrumentation, such as scalpels and needles, in a confined or poorly visualized anatomic site, however, Ross stated the patient potentially could face exposure to the technician's blood. He stated that because the task force had concluded that the job responsibilities of a surgical technician at Borgess required the worker to occasionally place his or her hands in a patient's body cavity in close proximity with sharp instrumentation where visualization of the operative site may be poor,[6] patient care and safety would be at some risk where a surgical technician was infected with HIV. He therefore concluded that Mauro could not perform the duties of a surgical technician without placing the patients at some direct risk.
 
 
 41
 Dr. Sanford Tolchin, also present at the task force meeting, also confirmed in his affidavit Hickman's statements to the task force, as well as Dr. Ross's comments concerning risk. In addition, he stated that he was aware of other HIV-positive employees at Borgess who continued to perform patient care duties because a committee determination had been made that the worker's job responsibilities did not raise a risk to patient care.
 
 
 42
 The written offer of an alternative employment position to Mauro provides further support for the task force's conclusion concerning a surgical technician's job responsibilities. This offer stated that an essential function of the O.R. surgical technician position is the ability to enter a patient's wound during surgery as directed by the attending surgeon. The offer concluded that because instruments such as needles and scalpels are used while the technician's hands are inside a patient's body cavity, potential exists for direct patient exposure to the surgical technician's blood.
 
 
 43
 Mauro offered nothing in response to the Hickman affidavit concerning the duties of a surgical technician. In the briefing before the trial court, Mauro argued as he does before us, that the job description did not call for a surgical technician to place his or her hands in the open wounds of surgery patients, although this would be required of surgical assistants. Further he asserts that, in fact, he did not place his hands in the operative sites. His testimony, however, indicates otherwise. The district judge recognized, based on Mauro's testimony, that he occasionally was required to place his hands "upon and into the patient's surgical incision to provide room and visibility to the surgeon." Mauro, 886 F.Supp. at 1349. The testimony we have outlined above demonstrates that the district court did not err in so quoting Mauro's direct statement that: "Usually if I had my hands near the wound, it would be to like, on an abdominal incision, to kind of put your finger in and hold--kind of pull down on the muscle tissue and ... pull that back."
 
 
 44
 The material issue as to whether Mauro was a direct threat or significant risk to the health and safety of others turns on whether his job duties require him, even on rare occasions, to have his hands in or near an operative site in the presence of sharp instrumentation where visibility is poor. Mauro's statement above, that at times he would place his finger in an incision in order to pull down on and pull back the muscle tissue, is consistent with Hickman's uncontradicted statement that the duties of a surgical technician require a surgical technician, on an infrequent basis, to hold back body tissue with a retractor or his or her hands to assist the surgeon in visualizing the operative site. Mauro's statements that he never had his hands in the operative cavity are not material, in light of the fact that on infrequent occasions he might be required to engage in invasive, exposure-prone activities. Further, his technical reliance on the written job description is not persuasive, as it does not purport to enumerate all activities Mauro might be required to perform, and Hickman provided a more detailed description of his job duties, that was the basis of the hospital Ad Hoc HIV Task Force decision. This Task Force was an expert review panel such as recommended in the Centers for Disease Control Report to consider Mauro's continued placement in the operating room as a surgical technician.
 
 
 45
 We also reject Mauro's argument that Dr. Davenport and Dr. DeYoung both gave favorable testimony on the risk issue, because Dr. Davenport's testimony acknowledged a risk of transmission, and Dr. DeYoung, when asked if his opinion would change if he knew a surgical technician had to have his or her hands in the body cavity, said he would consider this information.
 
 
 46
 We conclude that the district court did not err in determining that Mauro's continued employment as a surgical technician posed a direct threat to the health and safety of others. The district court based this conclusion on both the description of a Borgess surgical technician's duties indicating the necessity for a surgical technician to place his or her hands upon and into the surgical incision to provide room and visibility for the surgeon, and the risk of sustaining a needle stick or minor laceration which Mauro had in the past sustained. All the evidence, together with the uncontradicted fact that a wound causing an HIV-infected surgical technician to bleed while in the body cavity could have catastrophic results and near certainty of death, indicates that Mauro was a direct threat.
 
 
 47
 University of Maryland Medical System Corp. and Bradley, two recent cases cited by the district court involving HIV-positive health care workers further support our decision. In University of Maryland Medical System Corp., the Fourth Circuit held that the suspension of an HIV-infected neurosurgical resident did not violate the Americans with Disabilities Act and the Rehabilitation Act because he posed "a significant risk to the health and safety of his patients" that could not be eliminated by reasonable accommodation. 50 F.3d at 1266. In Bradley, an HIV-positive surgical technologist brought suit claiming that the hospital violated the Rehabilitation Act when, upon learning that Bradley was HIV-positive, the hospital reassigned Bradley as a procurement assistant in the purchasing department. 3 F.3d at 923. As in the case before us today, the disputed issue in Bradley was the probability of transmitting the virus. Id. at 924. The Fifth Circuit Court of Appeals held that Bradley "often c[ame] within inches of open wounds and plac[ed] his hand in the body cavity roughly once a day." Id. In addition, the court held that Bradley already had suffered five needle puncture wounds while working as a surgical technologist and therefore concluded that a surgical technician with Bradley's responsibilities was not "otherwise qualified." Id.
 
 
 48
 We conclude, after inquiry into the specific facts concerning Mauro's duties before the district court, see Abbott, 107 F.3d at 949, that the district court did not err in concluding that Mauro's continued employment as a surgical technician posed a direct threat to the health and safety of others and that there was no genuine issue of material fact.
 
 
 49
 Accordingly, we affirm the judgment of the district court.
 
 
 50
 BOGGS, Circuit Judge, dissenting.
 
 
 51
 There are two difficult legal issues in this case, somewhat intertwined with issues of political theory that are not for us to determine. The ADA, a statute duly enacted by Congress, and held to be constitutional in Crawford v. Indiana Dept. of Corrections, 115 F.3d 481, 486-87 (7th Cir.1997), demands that patient sovereignty and informed consent, normally paramount considerations (see, e.g., Washington v. Glucksberg, 521 U.S. 702, ---- - ----, 117 S.Ct. 2258, 2269-71, 138 L.Ed.2d 772 (1997)) not be respected. The ADA thus requires employers to employ people they would rather not employ, and by whom they believe, rightly or wrongly, their patients would prefer not to be ministered to.
 
 
 52
 The ADA requires that these decisions be made, not by the individuals involved, nor by our sense of what we would prefer as an employer or patient, but by a legal standard, laid down quite fuzzily by Congress, that still retains considerable ambiguity even after attempts at clarification by the courts, the CDC and the AMA.
 
 
 53
 The concept of "significant risk" that emerges from these authorities thus directly mandates that patients be exposed to, and employers be required to expose their patients to, some amount of risk that is deemed "insignificant" to some determining body. As with other questions of fact and degree in a civil case, a district judge may find that the relevant risk is so small as to be insignificant as a matter of law; so large as to be significant as a matter of law (in each case because no reasonable person could differ with the court's judgment, even though the contrary is staunchly asserted by the opposing attorneys); or, somewhere in between, so that reasonable minds could differ on the degree of risk, and so a jury must be permitted to determine the question.
 
 
 54
 Obviously, in the real world, subjective assessments of risk vary wildly with individual assessors and, no doubt, with the assessors' pre-existing attitude toward the cause of the risk. Assessment of the risk of second-hand tobacco smoke may be affected by whether your favorite aunt died of lung cancer and how you feel about the government as national nanny. Assessment of the risk of an infinitesimal amount of plutonium may vary depending on one's view of the nuclear power industry or the good intentions of the former Soviet Union. And assessment of the risk from an HIV-infected worker such as Mauro may depend on the attitude toward the types of activities that preponderantly cause HIV infection in the United States.
 
 
 55
 By law, however, none of these considerations have any significance. At bottom, the only relevant question is this:
 
 
 56
 Could reasonable minds differ on whether Mauro poses a "significant risk" based on the interpretative standards laid down by Arline and the CDC and AMA guidelines?
 
 
 57
 Based on my analysis of this case, I believe the answer must be yes. Although there are some people who believe that the Three Mice Iscano accident caused cancer all over the Northeast and some people who believe that the tiniest trace of dioxin will cause bladder cancer in anyone who ingests it, reasonable minds can, and do, differ from these beliefs, and over the "significance" of those risks.
 
 
 58
 In the same way, Mauro poses some risk. It is not ontologically impossible for him to transmit a disease of very great lethality. However, the chance that he will do so to any given patient is "small." Whether we call the risk "extremely small," "vanishingly small," "negligible," or whatever, assessing the risk remains a judgment that must be made by considering both the actual probability of harm and the degree of the consequences, just as the Supreme Court instructed us.
 
 
 59
 That is what the District Court did not do, and that is why I would reverse its decision and remand for reconsideration under the correct standard--a full assessment of both the risk and the consequence. The court agrees that some change is needed, but then jumps directly to the second difficult question, the application of the rules for more dangerous, "exposure-prone" procedures as opposed to merely "invasive" procedures. As a person uneducated in this particular area, I might have thought that "invasive" procedures, with the implication of intrusion into the body, and the absence of any qualifier, would be more dangerous than "exposure-prone" ones, with the contingent meaning of "prone" and the hopeful sound of mere "exposure."
 
 
 60
 However, we must live with the language given us, and we must try to make sense of it. Whatever the words mean, it is clear that "invasive" procedures, under the CDC guidelines, require no special precautions (beyond the quite considerable "universal" ones) and do not contemplate patient notification, while performance of exposure-prone procedures permits special restrictions on an infected employee and even, under some circumstances, the removal of an employee who performs those procedures. As set out at greater length below, the exact nature of Mauro's duties are a matter of considerable dispute, especially when the record is read, as we must read it, in a light most favorable to him. Whether the procedures he may perform cross the line from the merely "invasive" to the actionable "exposure-prone" is a genuine and material issue, on which reasonable minds can differ.I
 
 
 61
 In School Bd. of Nassau County v. Arline, 480 U.S. 273, 287-88 n. 16, 107 S.Ct. 1123, 1131 n. 16, 94 L.Ed.2d 307 (1987), the Supreme Court considered whether a tubercular teacher was "otherwise qualified" under the Rehabilitation Act of 1973, 29 U.S.C. § 794, which she would not be if she unavoidably presented "a significant risk to the health and safety of others." Observing that "[a] person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk," the Court stated that the district court, in determining whether a person poses a significant risk, must "conduct an individualized inquiry and make appropriate findings of fact." Id. at 287, 107 S.Ct. at 1130. In the context of an employee with a communicable disease, this "individualized inquiry" should include "appropriate findings of fact," including four "basic factors" suggested to the Court by the American Medical Association in its amicus brief in that case: "(a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties), and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm." Id. at 288, 107 S.Ct. at 1131, quoting Brief for American Medical Association as Amicus Curiae 19. The Court further stated that "courts should normally defer to the reasonable medical judgments of public health officials." Ibid. Language similar to the Court's holding in Arline was incorporated in the Americans With Disabilities Act, 42 U.S.C. §§ 12101 et seq., and by amendment into the Rehabilitation Act, 29 U.S.C.A. § 794(d).
 
 
 62
 In the case before us, the district court held that "a real possibility of transmission, however small" constituted a significant risk, "[b]ecause the consequence of [HIV] transmission is invariably death." Mauro v. Borgess Med. Ctr., 886 F.Supp. 1349, 1353 (W.D.Mich.1995). In so holding, the court effectively negated the Supreme Court's instruction to consider, as one of the "basic factors," the probability of transmission of contagious disease.
 
 
 63
 On appeal, it appears that this court recognizes that the district court erred in this way, for the court's opinion states, instead, that "our analysis ... must not consider the possibility of HIV transmission, but rather focus on the probability of transmission weighed with the other three factors of the Arline test." Op. at 403 (emphases in original). This recognition by the court offered the promise of a correct solution. Unfortunately, rather than proceeding to analyze the factor of probability of transmission, the court immediately moves on to the proxy question of the risk associated with surgical procedures that are described by the CDC as either "exposure prone" or merely "invasive." That is also an important subject, which I address in Part II; but because the courts are the final arbiters of what constitutes "significant risk" under the Rehabilitation Act and the ADA, see Abbott v. Bragdon, 107 F.3d 934, 945 (1st Cir.) (eschewing "obsequious obeisance to public health authorities"), cert. granted, --- U.S. ----, 118 S.Ct. 554, 139 L.Ed.2d 396 (1997), and because the "significance" of risk inescapably involves a judgment about the probabilities of harm, I believe it is imperative first to examine this connection further.
 
 
 64
 * The CDC "has estimated that the risk to a single patient from an HIV-positive surgeon ranges from .0024% (1 in 42,000) to .00024% (1 in 417,000)." Doe v. University of Md., 50 F.3d 1261, 1263 (4th Cir.1995); Op. at 405 (discussing deposition testimony of Dr. Davenport, in which he related this estimate). This estimate, of course, is for surgeons, who by the very nature of their work enter surgical wounds with sharp instruments during virtually every procedure they perform. Common sense--and, of course, the court's obligation to interpret the evidence in the light most favorable to the nonmovant--requires us to suppose, in the absence of contrary information, that the activities of a surgical technician such as Mauro who touched only the margin of the wound, and that only very rarely, would pose an even smaller risk. So may the resulting coefficients of risk--numbers somewhat smaller than .0024% to .00024%--still be deemed "significant?"
 
 
 65
 Unfortunately, neither the Arline Court nor the statutes in question define "significant" (any more than they define "risk"). However, it is evident that the chance of something happening may be reasonably considered more "significant" where the "something" is itself extremely momentous.[1] Where there is even a small chance of catastrophe, a prudent person will exercise more care than where there is an equally small chance of a mere annoyance.
 
 
 66
 Yet individuals who regard themselves as prudent will apply this principle differently, because the perception of the significance of risk is subjective. More than a few people refuse to fly, though commercial airlines are said to be safe compared to other modes of transportation. There may be some people who refuse to cross streets. Others go bungee-jumping. So there is an inescapable normative component to the judgment of whether the chance that even a great peril will come to pass is "significant" or not.
 
 
 67
 Neither Congress nor the Supreme Court has informed us what the norm is. I do not see why it falls to the court to supply it. The task here resembles the determination of negligence, which, in turn, classically depends on whether the defendant exercised reasonable care. The law entrusts the jury with assessing what is reasonable, by asking what a reasonable person would have done under the circumstances. Similarly, we depute to juries determination of community standards in obscenity cases.
 
 
 68
 My view is that, where the absence of a definite standard leaves the matter almost wholly subjective, "significant risk" should be found to exist--or not to exist--as a matter of law, thus supporting an order of summary judgment, only if reasonable minds could not differ as to that conclusion. See Anderson v. Liberty Lobby, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). It is not before the court whether the risk was so small as to be insignificant as a matter of law, but it is clear to me that Borgess failed to eliminate a genuine issue of fact as to whether the risk Mauro posed was "significant." It is obvious that reasonable people routinely and voluntarily submit to medical care (including non-essential medical care) and undertake non-medical activities that have a comparable or greater risk of causing grave injuries, including death, than the risk Mauro seems to have posed, based on the record we have.[2] Consequently, a jury might well find that Mauro's work as a surgical technician did not create a significant risk.
 
 
 69
 There is another reason for entrusting this question to a jury. The degree of risk a person with a communicable disease poses to others likely depends on specific facts or other assessments about that person, not just on aggregate data about the person's contagious disease--which is why the Court in Arline insisted upon an "individualized inquiry." Cf. Rizzo v. Children's World Learning Centers, 84 F.3d 758, 764 (5th Cir.1996) ("Whether one is a direct threat [e.g., whether one poses a significant risk to the health and safety of others] is a complicated, fact intensive determination, not a question of law"). To assess whether Mauro posed a significant risk, the decision-maker should know more about any particular hazards (physical or moral)[3] that might have affected the likelihood that this individual would transmit HIV to others. If surgeons whom the surgical technician assisted were to testify, for instance, that the assistant had a record of impeccable reliability, technical skills, and professionalism, and that they themselves were not concerned about risks they incurred by performing surgery with him, then a fact-finder could easily conclude that an employee with a contagious blood-borne disease did not pose a significant risk. On the other hand, if the testimony showed that the employee's co-workers found him to be inattentive, careless, and physically clumsy, then the jury might well conclude that, however small the theoretical risk of transmission, it would not be a safe bet for this particular person to continue working in surgery, and that he was not, therefore, "otherwise qualified."
 
 
 70
 It is perhaps to this end that the court notes that "the record included two incident reports involving Mauro [one of which] indicated that Mauro had sliced his right index finger while removing a knife blade from a handle on June 25, 1991, and another [of which] indicated that he had scratched his hand with the sharp end of a dirty needle while threading it on June 8, 1990." Op. at 404-05. However, there is absolutely no indication in the record, other than Nurse Hickman's wholly vague assertion that one of these incidents "might have resulted in patient exposure," that either of these events occurred during surgery, in proximity to a patient or another worker, or threatened anyone other than Mauro in any way. See Incident Reports, J.A. at 228, 229. Assessing someone's riskiness somewhat resembles assessing someone's credibility. Juries are thought to be best suited for such tasks. One can imagine many other important facts that could be developed at trial and influence a jury's conclusions--for instance, the employees's viral load (and therefore his degree of contagiousness) at the time of his termination,[4] and whether the person reliably took prescribed antiviral medications, and the effectiveness thereof.
 
 B
 
 71
 In any event, in deciding for itself that Mauro posed significant risk, the court has misconstrued the record. The court places great weight on Dr. Davenport's testimony regarding a "real risk," Op. at 405, but it has misconstrued that portion of his testimony, and ignored other parts of it. During cross-examination of Dr. Davenport, counsel for Borgess, in language approximating part of the CDC guidelines, asked him: "Do you agree that if a job requires an HIV infected worker to place his or her hands into a patient's body cavity in the presence of sharp instrumentation it represents a direct threat to patient care and safety?" Dr. Davenport responded: "At that point represents a risk, a real risk, to the patient care and safety." The district court stated that Dr. Davenport thereby "recognized that plaintiff's direct contact with a patient's body in surgery represented a risk, 'a real risk,' to the patient's care and safety." J.A. at 75.
 
 
 72
 This was error, for, as I discuss in the second part of my dissent, there is, at the least, a genuine issue of fact as to whether Mauro generally, or ever, placed his hands into a patient's body cavity in such a way as to be deemed particularly risky, i.e. "exposure prone," by the CDC. And, given the shape of the hypothetical question, Dr. Davenport was almost certainly answering what he took to be a hypothetical question that assumed the presence of the conditions stated in the CDC standard. Thus, interpreted fairly for summary judgment purposes, Dr. Davenport's acknowledgment of a "real risk" is of no harm to Mauro's position.
 
 
 73
 Most importantly in connection with Dr. Davenport's "real risk" testimony, both the panel and the district court totally disregard Dr. Davenport's insistent clarification a few sentences later in his testimony that the chance of transmission of HIV, even under the conditions of Borgess's hypothetical question, "are exceedingly low." J.A. at 76.
 
 C
 
 74
 I pause to discuss the cases the court relies on for support, Bradley and Doe. I strongly disagree with the district court's assertion that these cases are "materially indistinguishable" from this one. In Bradley, the plaintiff surgical technician placed his hand "in the body cavity roughly once a day." Bradley v. University of Tex., 3 F.3d 922, 924 (5th Cir.1993). "In the body cavity" certainly appears to be a deeper and conceivably more hazardous insertion than what Mauro did at the edge of the wound, but on the basis of the facts reported in Bradley it is hard to know. It is the comparative frequency of entry into a wound that immediately concerns us. As a statistical matter, Bradley was much more likely than Mauro, over time, to transmit HIV to some patient among the many in whose surgery they assisted. It was at least n times more likely for Bradley to transmit the virus than for Mauro to do so, where n is equal to the number of days that on average elapsed between Mauro's infrequent insertion of his fingers into the body cavity. So, if Mauro entered a patient's body cavity on the average of twice during each 250-day work year (a plausible estimate in light of the record), he was 125 times less likely than Bradley to transmit the virus over time. Even if Bradley's activity were properly deemed significantly risky, it is not at all apparent why something that is at least 125 times less likely to happen should also be considered significantly risky.[5]
 
 
 75
 Similarly, in Doe, the neurosurgeon performed procedures far more hazardous than anything Mauro ever did; and he performed them as part of virtually every operation. Doe, like Bradley, is simply not a very persuasive precedent for this case.D
 
 
 76
 The court today effectively announces that HIV seropositivity renders surgical workers not otherwise qualified as a matter of law. Among its other failings, that rule is based on earlier clinical information. It is true that Borgess's liability in the immediate case turns upon the state of medical knowledge at the time of its conduct. See Abbott v. Bragdon, 107 F.3d at 944. However, rules of law may be hard to dislodge despite changes in underlying circumstances. The court should not announce this decision without careful qualification that it is based upon older and incomplete medical information. For example, the CDC has reported that immediate treatment with antiviral medications after percutaneous exposure to HIV appears to reduce the rate of infection by approximately 80%. See Update: Provisional Public Health Service Recommendations for Chemoprophylaxis After Occupation Exposure to HIV, MORBIDITY AND MORTALITY WEEKLY REVIEW (June 7, 1996). Needles and other surgical implements have been redesigned to reduce risk. See Occupational Risk Needles with Covers and Dull Tips Can Reduce Sticks, BLOOD WEEKLY, Feb. 3, 1997 (describing CDC studies showing reduction in risk of needle sticks by up to 76%). And, as has been understood for almost two years now, combinations of protease inhibitors with nucleoside analogues can combat HIV in some patients with remarkable success. See, e.g., Lisa M. Krieger, Report of Halting HIV in its Tracks; Trio of Drugs Appears to Eliminate Active Virus, SAN FRANCISCO EXAMINER, July 11, 1996. It is not yet clear whether these drug therapies will be permanently effective, and even with them, HIV infection remains a grave condition. Nonetheless, HIV infection today may not entail the "inevitable death" assumed by the district court. In the weighing of the probabilities of transmission against the gravity of harm, such medical progress could well affect the determination of whether the risk of HIV transmission is "significant."
 
 E
 
 77
 To summarize this portion of my dissent: the district court, in finding that Mauro presented a significant risk to others as a matter of law, misapplied the standard found in Arline, and ignored relevant principles of risk observed by statisticians and by lay people. The court, though it corrects the district court's erroneous statement regarding the legal implication of a "real possibility of transmission, however small," fails to follow through on the analysis, and repeats and compounds various failures of the district court to observe the summary judgment standard. On the basis of the evidence in the record of an "exceedingly small" chance that Mauro would transmit HIV to a patient, I believe that there is, at the very least, a genuine issue of material fact as to whether he was not "otherwise qualified" as a result of his HIV seropositivity. The order of summary judgment was therefore erroneous, unless justified by the balance of the court's analysis.
 
 II
 
 78
 Rather than directly evaluating the probabilities, the court instead reaches its holding by relying on the Centers for Disease Control Guidelines regarding the participation of HIV-positive health-care workers in surgery. See Recommendations for Preventing Transmission of Human Immunodeficiency Virus and Hepatitis B Virus to Patients During Exposure-Prone Invasive Procedures, MORBIDITY AND MORTALITY WEEKLY REPORT (July 12, 1991) [hereinafter, "the CDC Guidelines," or "the Guidelines"]. In ADA and Rehabilitation Act cases, e.g., Doe v. University of Md., 50 F.3d 1261, 1266 (4th Cir.1995); United States v. Morvant, 898 F.Supp. 1157, 1166 (E.D.La.1995), the CDC Guidelines have been treated as tantamount to a statute, interpretative regulation, or other binding rule of law because of the Supreme Court's statement in Arline that "[i]n making these findings [of fact suggested as important in the incorporated AMA amicus brief], courts normally should defer to the reasonable medical judgments of public health officials." 480 U.S. at 288, 107 S.Ct. at 1131. The Guidelines identified two categories of surgical procedures: those that are merely "invasive," and for which no restrictions (other than "universal precautions") on HIV-positive health-care workers are appropriate; and the subset of invasive procedures that are "exposure-prone," and for which restrictions, including exclusion from participation, may be warranted.[6] In a general way, it might be thought that, for seropositive health-care workers who perform merely invasive procedures, there is a rebuttable presumption that the worker does not pose a significant risk; while seropositive health-care workers who perform exposure-prone procedures face a rebuttable presumption that they do create significant risk.
 
 
 79
 The court apparently has concluded, though without an explicit statement, that Mauro sometimes participated, or might be expected to participate, in "exposure-prone" procedures. This conclusion seems to flow from the belief that any time a health-care worker enters or touches the surgical wound with his fingers or hands, then it is an "exposure-prone" procedure. Op. at 406-07. The court appears to have misunderstood the Guidelines, which clearly contemplate that, in the ordinary case, "surgical entry into tissues, cavities, or organs or repair of major traumatic injuries" should be regarded only as "invasive" procedures, not "exposure-prone" ones. Guidelines at 4, 9.
 
 
 80
 There is a glaringly obvious reason why the court must be wrong in its interpretation. Mauro occasionally placed his fingertip at the margin of the surgical wounds. Surgeons, by comparison, must constantly place their fingers inside such wounds. Yet the CDC Guidelines are perfectly clear that many, if not most, invasive procedures such as surgeons perform are not regarded as exposure-prone. So how could the peripherally invasive work Mauro sometimes did be classified as exposure-prone? For the court to interpret Mauro's activity as being exposure-prone means a fortiori that virtually every procedure any surgeon ever performs must be deemed exposure-prone.
 
 
 81
 In addition to that reason, the descriptions in the record of what Mauro's job entailed simply do not suggest that his work had the characteristics of exposure-proneness, the relevant ones here being "the simultaneous presence of the HCW's fingers and a needle or other sharp instrument or object in a poorly visualized or highly confined anatomic site." Guidelines at 4. I presume that working with sharp instruments in a space that is cramped or shielded from view makes cuts or jabs more likely because the health-care worker cannot see the relative positions of fingers and instruments, or because the fingers and instruments are forced to be very close together.
 
 
 82
 Surgery being what it is, one can assume that Mauro's fingers would be in the general neighborhood of sharp instruments; but the record does not suggest (and if it suggests, by no means strongly enough to settle the matter on summary judgment) that his fingers ever were or were expected ever to be near sharp instruments while "in a poorly visualized or highly confined anatomic site."
 
 
 83
 The descriptions of Mauro's activities included Mauro's own deposition testimony, an affidavit by his supervisor, Sharon Hickman, R.N., and essentially equivalent affidavits by hospital administrators, Stephen Ross, M.D., and Sanford Tolchin, M.D.
 
 
 84
 In the testimony by Mauro that the court regards as most damning, he responded to questions by counsel for Borgess as follows:
 
 
 85
 Q. We had talked about having the hands in the wound area, correct?
 
 
 86
 A. That's correct. Usually if I had my hands near the wound, it would be like, on an abdominal incision, to kind of put your finger in and hold--kind of pull down on the muscle tissue and that--where the two met in like a V shape at the bottom and the top and pull that back. But it happened very, very rarely because they had retractors to do that.
 
 
 87
 Q. When that was done, was the purpose to try to give the surgeon more room, more visibility to see what he was doing, he or she was doing?
 
 
 88
 A. That's correct.
 
 
 89
 J.A. at 104. Elsewhere, Mauro responded as follows:
 
 
 90
 Q. Would you personally ever be inside a wound holding a retractor?
 
 
 91
 A. Me personally, no.
 
 
 92
 J.A. at 103.
 
 
 93
 Nurse Hickman stated in her affidavit that:
 
 
 94
 During the July 23, 1992 Task Force meeting, I informed the Task Force that the general job duties of a Surgical Technician were as follows: preparing and maintaining the equipment used during the course of a surgical procedure, including handing sharp instruments to the operating surgeon. On an infrequent basis, the Surgical Technician is required to assist in the performance of surgery by holding back body tissue, with the use of either retractors or the Technician's hands, to assist the surgeon in visualizing the operative site. The Surgical Technician also may assist the surgeon with suturing and other duties related to the performance of the operation.
 
 
 95
 ...
 
 
 96
 On other occasions ... due to the complexity or other requirements of the procedure, another pair of hands is needed in the operative site, and the Surgical Technician is required to assist. Most often, the Surgical Technician is required to assist in the operative site because more hands are needed to visualize the operative area.
 
 
 97
 J.A. at 341. Nothing in this language establishes that Mauro's fingers were ever in the presence of sharp instruments while in a highly confined or poorly-visualized anatomic site. The fact that he might help "visualize" an area for the surgeon by pulling open a wound does not mean that his own fingers, at the edge of the wound, were in a "poorly visualized" spot.
 
 
 98
 I think that a fair reading of Mauro's and Hickman's testimony is that he sometimes put his fingers on the exposed muscle tissue at the edge of an incision, and pulled it back to help a surgeon see inside. I grant that this could fairly be considered entry "into" the body cavity, in the same way (to use a homely analogy) that pulling back the covers of a bed requires one's fingertips to be, technically, "under" the covers. Nurse Hickman did not say that Mauro ever did or would be expected to do anything more intrusive than that. The language used by Mauro and Hickman suggests that, on the occasions in question, Mauro's fingers were at the margins of the wound, "holding back body tissue," not within the wound where space could be tight or it might be hard to see. The purpose was to expand the wound to help the surgeon see inside; but that does not mean that it was hard to see Mauro's fingers, out at the edge, or that his own fingers were in confined space. (Of course, a surgical procedure that might be exposure-prone for the surgeon would not necessarily be so for the surgical technician.) Comparing Mauro's and Hickman's words with those in the CDC Guidelines, I am quite confident that retraction of tissue at the edge of an incision is not work that occurs in a "poorly visualized or highly confined anatomic site," as the CDC must intend that description to mean.
 
 
 99
 On the basis of this record, there is a genuine issue of material fact whether any of Mauro's activities, as described by him, Nurse Hickman, and Dr. Ross and Dr. Tolchin, were "exposure-prone" as the CDC Guidelines use that term. Recall that under the Guidelines, a health-care worker's "surgical entry into tissues, cavities, or organs" does not, without more, constitute an exposure-prone procedure. The Guidelines clearly regard such entry into wounds as acceptable, absent particularly hazardous conditions. There is simply no solid evidence that Mauro's job, as he had performed it in the past or would be required to perform it in the future, included those dangerous conditions. There are only unsubstantiated allegations that such conditions would or might exist.
 
 
 100
 In concluding either as a matter of fact or of law that Mauro's retraction of surgical wounds constituted an "exposure-prone" procedure, the court has erred. If the outcome of the case is to turn on whether what Mauro did was "exposure prone" or not, as defined by the CDC, summary judgment was not warranted because there is a genuine issue of fact as to whether it was.
 
 III
 
 101
 I credit the court with a worthy instinct of primum non nocere in ruling in an area that is difficult and uncertain. The court may also have the sense that the equities of this case favor Borgess, in that the hospital offered Mauro a reasonable alternative job, which he refused to accept. Of course, the legal question is not whether Borgess threw Mauro out on the street, but whether it discriminated against Mauro under the standards of the ADA and Rehabilitation Acts by removing him from his original job. Neither of these impulses can justify the holding in this case, which I believe is erroneous for the reasons I have discussed above.
 
 
 102
 I therefore respectfully dissent.
 
 
 
 *
 The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 [1]
 Mauro's complaint also alleged a few violations of state law, but Mauro does not appeal these issues
 
 
 [2]
 The Honorable David W. McKeague, United States District Judge for the Western District of Michigan
 
 
 [3]
 After the district court ruling, Mauro died and his estate, by and through its independent personal representative, Sandra Mauro, was substituted as a party for Mauro
 
 
 [4]
 This statement describes material on page 28 of the transcript of Mauro's deposition. Pages 27 and 29, but not page 28, were filed with this court as an exhibit to Borgess's motion for summary judgment. The statement on page 28 is consistent with other deposition testimony given by Mauro
 
 
 [5]
 The dissent discusses success in recent medical advancements in treatment of AIDS, but this is hardly relevant to the time frame in issue in this case
 
 
 [6]
 In spite of this testimony, and indeed that of Mauro quoted supra page 12, the dissent states on numerous occasions that Mauro "touched only the margin of the wound." This scholarly and well-written dissent draws a number of comparisons that have little or no relationship to the record in this case. The dissent focuses entirely on Mauro's statement as to what he personally did, and not on the description of job duties considered by the task force
 
 
 [1]
 "Fear of harm ought to be proportional not merely to the gravity of the harm, but also to the probability of the event." Antoine Arnaud et al., LA LOGIQUE, OU L'ART DE PENSER (1682--1668) in Ian Hacking, THE EMERGENCE OF PROBABILITY: A PHILOSOPHICAL STUDY OF EARLY IDEAS ABOUT PROBABILITY, INDUCTION, AND STATISTICAL INFERENCE 77 (1975), quoted in Peter L. Bernstein, AGAINST THE GODS: THE REMARKABLE STORY OF RISK 71 (1996)
 
 
 [2]
 By comparison with the chances that people will suffer various perils to which they expose themselves by choice--or to which their doctors subject them--the chance of loss created by Mauro is not very high
 "In some 15% of appendectomies, the appendix turns out to be normal, with the patient's symptoms attributable to some other problem. This is generally considered an acceptable cost that is outweighed by the danger of not removing an appendix until its rupture cinches the diagnosis." L. Russ, B. Freeman & J. McQuade, ATTORNEYS MEDICAL ATLAS (1994) 27-14. "The death rate [in appendectomies] of .1% has been constant." Id. at 27-16. Thus, a prospective appendectomy patient faces a .00015 chance (15/100,000) of dying of surgical complications, though there was no need for the surgery in the first place.
 "The FAA allows [a pilot with a diagnosed heart condition] to continue flying provided that his doctors have determined that the risk of his suffering a sudden unexpected impairment due to his heart condition is de minimis." Professional Pilots Federation v. FAA, 118 F.3d 758, 765 (D.C.Cir.1997).
 "The odds of your dying in an accident on a passenger train are 1 per 5,000,000,000 passenger miles. Thus, on a trip of 500 miles, your risk of death is about 1 in 10,000,000." LARRY LAUDAN, THE BOOK OF RISKS: FASCINATING FACTS ABOUT THE CHANCES WE TAKE EVERY DAY 63-64 (1994).
 As the record shows, the CDC recommends that no special restrictions be placed on health-care workers who are known to be HIV-positive, and recommends disclosure of a health-care worker's seropositivity to patients only for exposure-prone procedures. Further, there is no general program for mandatory HIV testing among health workers. Anyone who knows this will assume, therefore, that HIV-positive surgeons and surgical technicians may be present in some numbers throughout the health-care system, and recognize that there is some chance (and a pretty big one, in comparison to the size of the risks of HIV transmission that we have been discussing) that, during surgery, they will be placed in an HIV-positive person's gloved hands. Yet patients who realize these things continue to undergo surgery, including elective surgery.
 
 
 [3]
 Definitions of these types of hazards may be found in George E. Rejda, PRINCIPLES OF RISK MANAGEMENT AND INSURANCE 7 (5th ed.1995) (emphases in original):
 A hazard is a condition that creates or increase the chance of loss. There are three major types of hazards: physical hazard, moral hazard, and morale hazard....
 A physical hazard is a physical condition that increases the chance of loss. Examples of physical hazards are icy roads that increase the chance of an auto accident, defective wiring in a building that increases the chance of fire, and a defective lock on a door that increases the chance of theft....
 Moral hazard is dishonesty or character defects in an individual that increase the frequency or severity of loss. Examples of moral hazard are faking an accident to collect insurance money [or] submitting a fraudulent claim....
 
 
 [4]
 The record shows that Mauro's titer level for HIV was very low just before his termination. Davenport Dep. at 59, J.A. at 186. Because there was a low concentration of virus in his blood, there would have been a reduced chance of transmission of HIV to a patient in the event of an accident. That the court does not notice or recognize the significance of this fact is another example of its failure to view the record in the light most favorable to the non-movant for summary judgment
 An employer might object that monitoring an HIV-positive employee's viral load would be an undue hardship, but that is a separate question.
 
 
 [5]
 In my view, Bradley was wrongly decided in any event. In Bradley, the court stated that "[a] cognizable risk of permanent duration with lethal consequences suffices to make a surgical technician with Bradley's responsibilities not "otherwise qualified." A cognizable risk is any risk greater than zero, so the Bradley court, like the district court here, ran afoul of the directive that, in this context, the employer need not eliminate risk
 
 
 [6]
 The CDC Guidelines state that "[c]urrently available data provide no basis for recommendations to restrict the practice of HCWs infected with HIV or HBV who perform invasive procedures not identified as exposure-prone, provided [universal precautions are followed]." The Guidelines defined "invasive procedure" as:
 '[S]urgical entry into tissues, cavities, or organs or repair of major traumatic injuries' associated with any of the following: '1) an operating room or delivery room, emergency department, or outpatient setting, including both physician's and dentist's offices; 2) cardiac catheterization and angiographic procedures; 3) a vaginal or cesarean delivery or other invasive obstetric procedure during which bleeding may occur; or 4) the manipulation, cutting, or removal of any oral or perioral tissues, including tooth structure, during which bleeding occurs or the potential for bleeding exists.'
 Guidelines at 9 (Appendix).
 Only a subset of "invasive procedures" are deemed to be "exposure-prone." The CDC Guidelines discuss these as follows:
 Despite adherence to the principles of universal precautions, certain invasive surgical and dental procedures have been implicated in the transmission of [Hepatitis-B Virus] from infected HCWs to patients, and should be considered exposure-prone. Reported examples include certain oral, cardiothoracic, colorectal ... and obstetric/gynecologic procedures.
 ...
 Characteristics of exposure-prone procedures include digital palpation of a needle tip in a body cavity or the simultaneous presence of the HCW's fingers and a needle or other sharp instrument or object in a poorly visualized or highly confined anatomic site. Performance of exposure-prone procedures presents a recognized risk of percutaneous injury to the HCW, and--if such an injury occurs--the HCW's blood is likely to contact the patient's body cavity, subcutaneous tissues, and/or mucous membranes.
 Experience with HBV indicates that invasive procedures that do not have the above characteristics would be expected to pose substantially lower risk, if any, of transmission of HIV and other blood-borne pathogens from an infected HCW to patients.
 Guidelines at 4 (emphasis in original). After setting forth these descriptions, the CDC issued recommendations including the following:
 All HCWs should adhere to universal precautions, including the appropriate use of hand washing, protective barriers, and care in the use and disposal of needles and other sharp instruments.
 ...
 Currently available data provide no basis for recommendations to restrict the practice of HCWs infected with HIV or HBV who perform invasive procedures not identified as exposure-prone, provided the HCWs practice recommended surgical or dental techniques and comply with universal precautions....
 HCWs who perform exposure-prone procedures should know their HIV antibody status....
 HCWs who are infected with HIV or HBV ... should not perform exposure-prone procedures unless they have sought counsel from an expert review panel and been advised under what circumstances, if any, they many continue to perform these procedures. Such circumstances would include notifying prospective patients of the HCW's seropositivity before they undergo exposure-prone invasive procedures.
 Guidelines at 5 (footnote omitted).